[Nos. E000392, E000461. Fourth Dist., Div. Two. June 15, 1987.]

J. R. NORTON COMPANY, Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO, Real Party
in Interest.

## COUNSEL

Dressler, Quesenbery, Laws & Barsamian, Marion I. Quesenbery, Lewis Janowsky and Patricia J. Rynn for Petitioner.

Manuel M. Medeiros, Daniel G. Stone, Kevin Robinson and Richard Michael Fischl for Respondent.

Dianna Lyons, Federico G. Chavez, Daniel A. Garcia and Wendy Sones for Real Party in Interest.

OPINION

**RICKLES, J.**—Petitioner J. R. Norton Company (Norton or employer) seeks a review of a final decision and order of the Agricultural Labor Relations Board (Board or ALRB) in the *Matter of J. R. Norton Company* (1982) 8 ALRB No. 76 and in the *Matter of J. R. Norton Company* (1983) 9 ALRB No. 18.

Norton contests the Board's findings it violated the Agricultural Labor Relations Act (ALRA or act) in 8 ALRB No. 76 by: (1) failing and refusing to rehire members of Crew W because of their union support (§ 1153, subds. (a), (c));[1] (2) threatening an employee with discharge because of his union activities (§ 1153, subd. (a)); (3) instituting a wage increase without bargaining in good faith with the union (§ 1153, subds. (a), (e)); (4) failing to bargain before changing labor camp accommodations (§ 1153, subds. (a), (e)); and (5) refusing to rehire employees who participated in work stoppage during the Salinas harvest (§ 1153, subds. (a), (c)).

Norton contends the Board abused its remedial discretion by (1) issuing an overbroad cease and desist order; (2) ordering Norton to "make whole" employees for damages suffered as a result of Norton's unilateral wage increase; (3) failing to cut off backpay after the 1979 season; (4) computing backpay by use of the *J & L Farms* formula; and (5) using the *Lu-Ette Farms* formula for computing interest on backpay awards.

Norton contests the Board's finding it violated the ALRA in 9 ALRB No. 18 by: (1) failing and refusing to rehire Elodio Aguirre (Aguirre) and Alberto Sanchez (Sanchez) because of their union support (§ 1153, subds. (a), (c)); (2) failing to rehire Jose Espinoza (Espinoza) because of union support (§ 1153, subds. (a), (c)); (3) unlawfully interrogating and threatening Atilano Jiminez Martinez (Jiminez) regarding his union activities and the filing of an ALRB charge (§ 1153, subds. (a), (c), (d)); and (4) interferring with and surveilling union activities by Antonio Roman (Roman) (§ 1153, subd. (a)).

---

[1] Unless otherwise specified, all statutory references are to the California Labor Code.

Section 1153, subdivisions (a), (c), (d), and (e), provide: "It shall be an unfair labor practice for an agricultural employer to do any of the following:

"(a) To interfere with, restrain, or coerce agricultural employees in the exercise of the rights guaranteed in Section 1152.

". . . . . . . . . . . . . . . . . . . . . .

"(c) By discrimination in regard to the hiring or tenure of employment, or any term or condition of employment, to encourage or discourage membership in any labor organization.

"(d) To discharge or otherwise discriminate against an agricultural employee because he has filed charges or given testimony under this part.

"(e) To refuse to bargain collectively in good faith with labor organizations certified pursuant to the provisions of Chapter 5 (commencing with Section 1156) of this part."

In 9 ALRB No. 18, Norton claims the remedial order issued by the Board was punitive because it required an excessive number of mailings and applied the *Lu-Ette Farms* (1980) 8 ALRB No. 55 interest rates to the backpay awards.

## INTRODUCTION

Norton is a large lettuce producer with its corporate headquarters located in Phoenix, Arizona. Norton's administration and management are centralized in Phoenix, Arizona. Its payroll operations and all other company records are also maintained in Phoenix. It carries on an extensive year-round farming and harvesting operation in California, New Mexico and Arizona. Norton's harvesting sequence is as follows: January to March in the Imperial Valley, California; early March to early April in Blythe, California; April in Arizona; late April or early May to early October in Salinas, California; October in New Mexico; late October to early November in Central Arizona; late November to late December in Blythe, California. There may be an overlap of a week or more between harvesting that is winding down in one location and one that is starting up at the next location. Norton maintains offices in Salinas, Brawley (Imperial Valley), Palo Verde (Blythe), and Chandler, Arizona, to assist in coordinating the farming operations in those areas.

United Farm Workers (UFW or union) was certified as the exclusive bargaining agent for Norton's Salinas area agricultural employees in November 1975. The UFW was certified as the exclusive bargaining agent for Norton's Imperial Valley and Palo Verde areas in August 1977. Norton has never signed a contract with the union. The claimed unfair labor practices arose primarily out of the Salinas operation.

## I

## 8 ALRB No. 76

## RES JUDICATA

As indicated Norton operates a number of fields in California, Arizona and New Mexico. The UFW has been elected the sole bargaining agent for some of these operations. Many people stay with Norton as the harvesting season moves from one field to another.

The UFW filed separate charges against Norton for alleged ALRA violations in different fields. Two separate administrative law judge (ALJ) decisions were rendered, and two separate ALRB decisions resulted. (8 ALRB

No. 76 and 8 ALRB No. 89.) In reviewing the 8 ALRB No. 76 opinion, this court consolidated it with 9 ALRB No. 18 which required "dead-time" while the record was prepared in the latter case. During this dead time, both the First District Court of Appeal and the State Supreme Court summarily denied petitions for review of 8 ALRB No. 89.

Because of Norton's circuit-harvesting process, similar issues can be found in 8 ALRB No. 76 and 8 ALRB No. 89. Interestingly enough, the Board concluded these cases were not proper for consolidation. Now we are requested to give res judicata effect to 8 ALRB No. 89 in our present review of 8 ALRB No. 76.

■■■ Briefly, res judicata will preclude parties or their privies from relitigating issues that were or could have been raised in a prior action that has resulted in a final judgment. The related concept of collateral estoppel will preclude relitigation of an issue of fact or law necessarily decided in a prior judgment in a subsequent suit involving a party to the first case. (*Allen* v. *McCurry* (1980) 449 U.S. 90, 94 [66 L.Ed.2d 308, 313, 101 S.Ct. 441].)

Although the final order in 8 ALRB No. 89 came from an administrative body, this will not preclude the res judicata and collateral estoppel doctrines from operating. (*People* v. *Sims* (1982) 32 Cal.3d 468 [186 Cal. Rptr. 77, 651 P2d 321].) ■■■ The final judgment rule is in effect as a result of the Supreme Court's denial of the petition. Although the ALJ and ALRB decisions in both cases were handed down at relatively the same time, we as an appellate court will give res judicata effect to the 8 ALRB No. 89 opinion insofar as it is applicable. (*Domestic & Foreign Pet Co., Ltd.* v. *Long* (1935) 4 Cal.2d 547, 562 [51 P2d 73].)

■■■ Res judicata effect will be given only to those matters which were directly in issue and in fact decided. (Code Civ. Proc., § 1911; *County of L.A.* v. *Continental Corp.* (1952) 113 Cal.App.2d 207, 219 [248 P.2d 157].) ■■■ The UFW raises four issues which it contends deserve res judicata effect. First, whether certain discriminatees were engaged in protected activities during Norton's 1979 Salinas harvest. Second, whether certain discriminatees' participation in a series of work stoppages in the 1979 Salinas harvest was condoned by Norton. Third, whether Norton's failure to rehire those workers at subsequent harvests was contrary to its past hiring practices. Fourth, whether Norton was illegally motivated in refusing to rehire the discriminatees in its subsequent harvests.

In 8 ALRB No. 89 at page 15, one of the issues was whether Norton discriminatorily failed to rehire certain 1979 employees in its Salinas harvest of 1980. Sometime in August 1979, a number of workers at the Salinas

location engaged in work stoppages designed to coerce Norton into collective bargaining. In September Norton began replacing these workers, but ultimately allowed some of them to return after signing a document indicating they would not leave work unless instructed to do so. Some of these employees found it difficult to obtain work with Norton in future harvests. Hence, the issue as stated above was presented for resolution.

The Board concluded Norton abandoned an informal seniority system of hiring, that Norton condoned the work stoppages, which entitled those who signed the document to protection of the "condonation doctrine" and therefore "Norton discriminatorily failed and refused to rehire the 1979 work stoppage participants for the 1980 Salinas harvest."

In making this finding the Board relied on evidence from 26 of the work stoppage participants to conclude the entire group had been subject to unlawful labor practices. The Board acknowledged that generally *each* discriminatee must prove he or she made application when work was available, that an established policy existed to rehire former employees, and the applicants' failure to be hired was based on a protected activity. The Board, in relying on *Kawano, Inc.* v. *Agricultural Labor Relations Bd.* (1980) 106 Cal.App.3d 937 [165 Cal. Rptr. 492], did not require individual proof. The *Kawano* "class discrimination theory" provides "if an employer unequivocally and publicly promulgates his unconditional refusal to rehire a certain category of employees, proof of such promulgation excuses the need to prove individuals in the category made application for rehire which would under the circumstances have been futile." (*Id.,* at p. 952.) In its makewhole order, the Board specified 31 persons only had been the subject of unfair labor practices.

We now answer the UFW's specific requests for res judicata effect. The UFW cites to pages 34-35 of 8 ALRB No. 89, arguing the Board concluded the discriminatees were engaging in protected activities during Norton's 1979 Salinas harvest. Neither these specific pages nor any others in this opinion explicitly or implicitly state such a conclusion.

Next, res judicata effect is requested for the Board's conclusion that 1979 Salinas work stoppages were condoned by Norton. The Board indeed made such a conclusion. In the present case the precise facts of the 1979 Salinas work stoppages have been presented striving for the conclusion that unfair labor practices resulted in other fields. The UFW would seek an ipso facto conclusion that because Norton condoned the work stoppages in Salinas, all workers who signed the condonation document were the subject of unfair labor practices.

Despite the "class determination theory," we cannot conclude *all* the workers were the subject of unfair labor practices. In 8 ALRB No. 89, hiring practices were established only for the Salinas operation. Norton operated a number of fields, each obviously unique in size, and each requiring different amounts of manpower to effect harvest. In order to establish an unlawful labor practice in this instance, it must be established (1) that each individual worker presented him or herself for hire in a timely manner and in a situation wherein Norton was hiring; (2) Norton's policy was to rehire former workers; (3) that the individual was refused rehire because he or she participated in the 1979 Salinas work stoppages; and (4) the 1979 Salinas work stoppages were condoned by Norton. Under res judicata notions, we shall accord the fourth issue above *only* as having been conclusively established in 8 ALRB No. 89.

The fact that a particular employee can establish all four elements above regarding the Salinas operation cannot, except for the fourth element, be used to establish unfair labor practices in any of Norton's other fields. Individual competent evidence concerning each of these fields as is relevant to the elements above must be presented to the trier of fact.

Next the UFW cites us to page 33 of 8 ALRB No. 89, stating the Board concluded Norton's failure to rehire 1979 Salinas stoppage workers at subsequent harvests was contrary to its past hiring practices. As indicated above, this is true only with respect to the Salinas operation. The Board limited its decision to Salinas. Because of the unique nature of each field this particular fact is irrelevant to any issues presently before this court. In any event, page 33 does not substantiate the UFW's contention.

Finally the UFW wants res judicata effect that Norton was illegally motivated in refusing to hire the discriminatees in its subsequent harvests. Again, the case was limited to the failure to rehire *in Salinas*. The failure to rehire in Salinas would be irrelevant to the question of whether unlawful discrimination occurred in the other fields.

Therefore, only the fact that Norton condoned the 1979 work stoppages is relevant to 8 ALRB No. 76, and it is accorded res judicata effect.

### REFUSAL TO REHIRE CREW W

The ALRB general counsel (General Counsel) charged Norton with a violation of section 1153, subdivisions (a) and (c), of the act by laying off

wrapping Crew W on May 23 without just cause. A hearing before an ALJ[2] was held concerning this alleged violation. The ALJ found: Norton violated the act by the unlawful layoff of Crew W because of its support for the UFW and recommended each member of Crew W be granted full reinstatement to his former or substantially equivalent jobs effective immediately. The ALJ's finding and orders specifically excluded the five or six persons on Crew W who were transferred to other crews on the date the layoffs occurred.

Upon review, the ALRB rejected the ALJ's conclusion that the layoff of Crew W constituted a violation of the act. The Board concluded the layoffs resulted from a mechanical breakdown of the wrap machine and not because of any discriminatory action on the part of Norton. The Board then went on to find Norton violated section 1153, subdivisions (a) and (c), by failing and refusing to rehire the members of Crew W later in the season when the new wrap machines were put into operation.

General Counsel did not at any time seek to amend the violation from improper layoff of Crew W to refusal to rehire Crew W before the Board's decision. The Board's broad finding applying the refusal to rehire all of Crew W was made without notice to Norton of the substituted charge and the opportunity to defend against it. The ALJ heard testimony of Maria Raquel Ramirez, Romona Lujan, and Maria Soila Lerma concerning the circumstances of their layoff and Norton's failure to rehire them. This testimony was considered for the purpose of establishing union animus as a reason for the initial layoff on May 23. It is difficult, if not impossible, to conclude a failure or refusal to rehire the *entire* Crew W was *"fully litigated."*

Ramirez's, Lujan's and Lerma's testimony could conceivably be sufficient to put Norton on notice that they were contending they were discriminatorily refused rehire. Therefore, we conclude Norton's failure and refusal to rehire Ramirez, Lujan and Lerma was fully litigated and forms the basis for a violation of section 1153, subdivisions (a) and (c), of the act.

The Board finds Norton's knowledge of Crew W's union activities, coupled with strong evidence of its anti-union animus, and the fact that crew members were not recalled, even after new wrap machines were put into operation, established General Counsel's prima facie case of a section 1153, subdivision (c), violation, i.e., illegal failure to rehire. The Board then goes on to find upon the establishment of a prima facie case by the General Counsel, the burden shifts to Norton to establish that it would have taken

---

[2] At the time of the issuance of the ALJ's decision in 8 ALRB No. 76, all ALJ's were referred to as administrative law Officers. (See Cal. Admin. Code, tit. 8, § 20125, amended eff. Jan. 30, 1983.)

the same action absent the employees' protected activities. The province of the Board is to resolve, not to find, issues. ■ Where evidence is introduced on one issue set by the pleadings, its introduction cannot be regarded as authorizing the determination of some other issue not presented by the pleadings. (See *Crescent Lumber Co. v. Larson* (1913) 166 Cal. 168, 171 [135 P. 502]; *Marvin v. Marvin* (1981) 122 Cal.App.3d 871, 875 [176 Cal. Rptr. 555].) ■ Because Norton was not advised that failure to rehire was the activity it needed to defend against, it is not surprising the Board found Norton failed to present evidence justifying a failure to rehire. Consequently Norton had no opportunity to gather evidence or prepare legal arguments refuting the occurrence of such violations. Fundamental fairness includes both the right to adequate notice and the right to defend against charged violations. The lack of notice runs contrary to elementary constitutional principles of procedural due process which requires the Board's findings be set aside. (See *Sunnyside Nurseries, Inc. v. Agricultural Labor Relations Bd.* (1979) 93 Cal.App.3d 922, 933 [156 Cal.Rptr. 152].)

■ As an independent ground for supporting this conclusion, we find that, despite the due process violations, there is no substantial evidence to support the Board's finding. "Findings of the board with respect to questions of fact are conclusive if supported by substantial evidence on the record considered as a whole. [Citations.] While the administrative agency under this test is empowered to resolve conflicts in the evidence and to make its own credibility determination, 'the test of substantiality must be measured on the basis of the entire record, rather than by simply isolating evidence which supports the board and ignoring other relevant facts of record which rebut or explain that evidence.' [Citations.]" (*Martori Brothers Distributors v. Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 721, 727-728 [175 Cal.Rptr. 626, 631 P.2d 60].)

Both the Board and ALJ found the entire 30-person crew was not recalled. The ALJ concluded on page 18 of his decision: "As indicated previously, no one laid off from Jose's wrap machine was recalled for work again." This sentence is followed by footnote 48, citing to the record volume 3 of the reporter's transcript, pages 126 and 144; volume 4, reporter's transcript, pages 8 and 9; and volume 13, reporter's transcript, page 82. These citations to the record refer to Ramirez's, Lerma's and Lujan's testimony, respectively; however, they do not support the finding by the ALJ. The testimony referred to is attached as Appendix A. It only supports Ramirez's, Lerma's and Lujan's efforts to be reemployed by Norton. Ramirez testified after the layoff she went home but later discovered two members from Crew W had been rehired by Norton. The Board ignored evidence concerning rehire by Norton produced by the General Counsel in the form of the testimony of Maria Estela Mendoza. Mendoza testified she was

elected a union crew representative for Crew W before the May layoff. She testified she engaged in union activities prior to the layoff. Mendoza testified she was reemployed in July on another machine. The status of the record at this point shows Crew W consisted of 30 workers, five or six were immediately assigned to other work, three requested to be rehired and were refused, one requested rehire and was rehired. Two were rehired under circumstances not shown by the evidence.

No evidence was introduced to show any other member of Crew W sought rehire or was refused rehire. Crew W's foreman took all Crew W's members' phone numbers and addresses and told them he would call them when the machine was fixed. No evidence was introduced to show the machine was fixed during the Salinas season.

Crew W's foreman was not reassigned to another wrap machine but was transferred to the ground crew for the remainder of the Salinas season.

There were four machines in operation at the time of the layoff. The other machines were transferred in and out, and at times there were four machines in operation, a number equal to the machines in operation at the time of the layoff.

On this record and without any further evidence having been produced by the General Counsel concerning whether the remainder of Crew W was rehired, the Board concluded the members of Crew W were not required to present themselves for rehire as the responsibility for locating and rehiring rested with Norton; Norton had failed to show Crew W would have been rehired had they presented themselves. Therefore, the remainder of Crew W was discriminatorily not rehired.

We are not dealing here with the credibility of witnesses which is within the exclusive province of the Board but are examining the record to determine whether the contradictory evidence and the evidence from which conflicting inferences can be drawn override the conclusion of substantiality made by the Board. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight—a Board's findings are entitled to respect but they must nevertheless be set aside when the record before a Court of Appeal clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of the witnesses or its informed judgment on matters within its special competence or both. (*Universal Camera Corp.* v. *Labor Bd.* (1951) 340 U.S. 474 [95 L.Ed. 456, 468-469, 71 S.Ct. 456]; *Merrill Farms* v. *Agricultural Labor Relations Bd.* (1980) 113 Cal.App.3d 176, 182 [169 Cal.Rptr. 774].) Considering the record as a whole, we must conclude the testimony of Ramirez,

Lerma and Lujan provides an insufficient basis to conclude all of the members of Crew W were discriminatorily refused rehire. The Board's finding that Norton discriminatorily refused to rehire Crew W, except as it relates to Ramirez, Lerma and Lujan, is not supported by substantial evidence and is annulled.

### THREAT TO DIEGO DE LA FUENTE

De La Fuente was a cut-and-pack worker on a ground crew employed by Norton in Salinas in 1979. He was active in union activities and attended a number of union meetings. The testimony is contradictory as to the number of meetings De La Fuente attended; the number of times he was absent from work; and from whom he obtained permission to be absent. ■ These are all matters of credibility of witnesses and the finder of fact will only be reversed in exceptional circumstances. (See *N.L.R.B.* v. *Massachusetts Mach. & Stamping, Inc.* (1st Cir. 1978) 578 F.2d 15, 20.)

The ALJ found: "During the week of August 31 Diego missed some work with permission three times. On August 28 he attended the negotiating session between the company and the UFW as President of the workers negotiating committee. On two other occasions he attended meetings as a member of the workers industry negotiating committee. Permission to attend on two of the occasions was given by Santamarie before he left on vacation for two weeks while Abel Luna, one of the seconds, gave him permission to leave work the third time." (Fn. omitted.)

The Board found: "De La Fuente had missed work three times during the week, twice for meetings of a worker's industry negotiating committee and once for the August 28, negotiations meeting between Respondent and the UFW. He had received prior permission for each absence from either foreman Roberto Santamaria or crew pusher Abel Luna. When De La Fuente returned from the third meeting, Ramirez, who had just replaced foreman Santamaria while he was on vacation, angrily told De La Fuente in the presence of the crew that the next time De La Fuente went to a meeting, he would have to ask Ramirez for permission personally, and that Ramirez would fire him the next time he was late."

De La Fuente testified he did not ask for permission from Ramirez because he did not know Ramirez was his foreman as he had not seen him as a foreman before this day, i.e., August 31. Both the Board and the ALJ found the testimony of De La Fuente to be credible concerning these times and the permission given.

These findings cannot be reconciled with the undisputed testimony. Santamaria went on vacation on the 15th or 16th of August and did not return

until the 4th of September; Ramirez replaced Santamaria as foreman from August 15 or 16 to September 4 while Santamaria was on vacation. These irreconcilable differences provide exceptional circumstances for placing the findings of the ALJ and the Board based on De La Fuente's testimony in serious doubt.

Even if foreman Santamaria was available on two occasions and foreman Ramirez available when the incident in question occurred, De La Fuente on that one occasion (Aug. 31) deviated from his own practice of clearing his absence with the foreman.

Having pointed out some major flaws in the ALJ's and the Board's reasoning, we turn to another reason why this finding of a violation of section 1153, subdivision (e), cannot stand.

■ We agree a threat to discharge an employee for engaging in protected union activities violates section 1153, subdivision (a), of the act and that De La Fuente's attendance at a union meeting on the day in question would be protected activity. Neither the employer's motive nor the success of the coercion is an element of a section 1153, subdivision (a), violation. The test is whether the employer engages in conduct which it may reasonably be said tends to interfere with the freedom of the exercise of the employee's rights under the act. (*Merrill Farms* v. *Agricultural Labor Relations Bd., supra,* 113 Cal.App.3d 176, 183-184.) It is true no evidence is required to show actual interference, restraint or coercion, in evaluating whether the conduct tended to interfere with the free exercise of the employee's right. (*Pandol & Sons* v. *Agricultural Labor Relations Bd.* (1979) 98 Cal.App.3d 580, 587 [159 Cal.Rptr. 584].) ■ However, the complete lack of evidence that any employee was actually intimidated or coerced, coupled with the affirmative evidence that De La Fuente continued his union activities to the maximum should persuasively indicate the threat accomplished nothing.

■ This evidence of lack of effect can be considered when measuring Ramirez's conduct in furthering the business interests of Norton. Ramirez had the responsibility to control time-off requests by his crew in order to appropriately schedule the daily work. Daily work schedules could not be properly maintained unless hit-and-miss work habits by members of his crew were discouraged. ■ Ramirez's conduct in attempting to discipline De La Fuente's failure to request permission to be late for work from his direct supervisor furthered the business interests of Norton.

■ "In the absence of union discrimination, the administrative board lacks any control over an employer's business policies. [Citation.] The mere fact that an employee is or was participating in union activities does not

insulate him from discharge for misconduct or give him immunity from routine employment decisions. [Citations.]" (*Martori Brothers Distributors* v. *Agricultural Labor Relations Bd., supra,* 29 Cal.3d 721, 728-729.)

■ We conclude under these circumstances there is no substantial evidence to support a finding that De La Fuente was threatened with discharge because of union activities. Norton's actions in this instance were reasonable and did not constitute a threat which interfered with, restrained, or coerced De La Fuente from engaging in protected activities under the act.

The Board's finding Norton violated section 1153, subdivision (a), of the act is annulled.

WAGE INCREASE

The UFW is the certified exclusive bargaining agent of Norton's agricultural employees. Negotiations have been carried on between Norton and the UFW for several years without successfully reaching an agreement on a contract. From 1976 until approximately June 1979, Norton and the UFW were operating under basic terms of the UFW's contract with Inter Harvest (master agreement) while continuing to bargain with the UFW over local issues. In July 1977 and July 1978, Norton, with the consent of the UFW instituted wage increases for its workers consistent with the industry-wide wage adjustment specified in the master agreement.

In June of 1979, the UFW began bargaining for new contracts with the industry growers. Norton advised the UFW it was not participating in the industry-wide bargaining. On August 20 and 21, Norton's employees engaged in work stoppages resulting in Norton's agreement to meet in a bargaining session with the UFW. This meeting was held on August 28. At this meeting Norton presented the UFW a proposal similar to the initial proposal made by growers at the industry-wide session in June. Norton's proposal contained a wage adjustment. Norton indicated a desire to implement this wage adjustment immediately. UFW opposed the immediate implementation and indicated the wage proposal was too low and they desired to bargain over all the aspects of the contract. The UFW indicated they needed time to study Norton's proposal and another meeting was scheduled for September 12.

On September 5, Norton sent the UFW a telegram increasing its prior wage proposal and indicating the increase would be effective September 10 unless the union objected. On September 6, the UFW wired Norton rejecting the proposal and reaffirmed that the economic and noneconomic issues

were still subject to negotiations. On September 7 Norton wired the UFW requesting reconsideration of its position and indicated the company stood ready to meet with the union to resolve the differences. The parties met on September 12. The UFW indicated the following: Objected to the implementation of the September 5 wage proposal, it desired a contract on all issues, offered to begin a full-fledged bargaining session with Norton starting with the UFW's industry-wide proposal and offered Norton a settlement based on the terms of the contract recently consummated between the UFW and Sun Harvest with modifications to accommodate local concerns. Norton indicated a need for time to review the proposals and indicated it would get back to the UFW at a later date. Norton instituted the wage adjustments proposed in its September 5 telegram on September 12 effective with the paychecks covering the payroll period from September 4 through 10.

█ Norton contends the unilateral wage increase did not violate its duty to bargain in good faith because the wage increase was a continuation of Norton's past practice and notice to the UFW had preceded the implementation.

Norton's contention this wage increase is consistent with past practice is without merit. The wage increases instituted in 1977 and 1978 were made pursuant to the Inter Harvest (master agreement) and with the consent of the UFW. Norton and the UFW ceased operating the Inter Harvest Agreement approximately four months before Norton unilaterally increased wages. This hardly allows sufficient time to establish a longstanding practice. This short period of time, coupled with the recent face-to-face negotiations between the parties, the employee unrest over Norton's bargaining posture, Norton's hiring additional replacement workers making a revision of its pay scale necessary, and the fact that work stoppages were ongoing, constitute substantial evidence to support the Board's determination the wage increase did not result from Norton's past practice.

We turn now to Norton's contention it was authorized to unilaterally institute wage increases because the increase occurred after notice and consultation with the UFW. Cases cited by Norton, the UFW and the Board all provide that before a unilateral wage increase may be implemented, an attempt by good faith bargaining must be undertaken to resolve the parties' differences. Here, Norton made its original wage proposal to the UFW on August 28, on September 5 passed an increase in wages, and indicated its intention to implement this proposal September 10; the union rejected the proposal on September 6, Norton requested reconsideration on September 7, the parties met in a negotiating session on September 12, Norton indicated it would get back with the UFW after this session. Norton unilaterally increased its wages on September 12. This scenerio hardly indicates good

faith bargaining on behalf of Norton. The unilateral wage increase institut-
ed by Norton and found by the Board to be a violation of section 1153,
subdivisions (a) and (e), of the act is affirmed.

## CHANGE IN LABOR CAMP ACCOMMODATIONS

It is undisputed Norton has historically in the past provided a labor camp
in most of its harvesting locations where male workers who desired could
live and take meals. Norton provided a leased labor camp for its Salinas
male workers without charge.

Before September 13, 1979, Norton provided employees residing in the
Salinas labor camp with a kitchen and various cooking utensils, including
pots, pans, spoons, knives, forks, glasses, and a coffee maker. The employees
purchased food on a line of credit maintained by Norton with a local
merchant. The cost of the food was deducted from their pay.

On September 13, Norton's employees were engaged in work stoppages
and were being replaced. That same date three Norton supervisors accom-
panied by two policemen arrived at the camp. The supervisors confiscated
the cooking utensils, throwing out the food contained in some of them and
leaving the workers only two small bowls and a lid to one of the confiscated
pans. Norton terminated the employees' access to its line of credit at the
local store. The evidence does not reveal whether any of Norton's employ-
ees were required to move out of the labor camp. The employees returned to
work the following week. They worked without incident for the rest of the
Salinas harvest. Norton did not return the utensils or restore the line of
credit with the local merchant. The employees were required to purchase
replacement utensils and to establish their own line of credit with the local
merchant.

The kitchen utensils and equipment were allegedly removed because the
camp residents no longer worked for Norton. The utensils were to be trans-
ported and set up in the New Mexico labor camp. The utensils were loaded
on a Norton bus and driven to the company's shop in Salinas where they
remained.

Norton contends it owned the kitchen utensils and had no duty to
provide the replaced workers with a labor camp or utensils. A new cook and
food were provided by Norton when the employees returned to work on
September 17, and the utensils were taken to New Mexico to be used in the
next harvest.

These contentions do not provide a defense to the allegation that Norton
violated the act by unilaterally changing the wage and working conditions

of its employees. The replaced employees who lived in the labor camp were not discharged. Norton allowed them to remain in the labor camp during the period of work stoppages and the periods when they were replaced. The cooking utensils were never restored nor were the same arrangements made for the purchase of food during the remaining Salinas harvest.

It is true Norton may not have had a duty to provide employees free lodging, kitchen utensils and a line of credit before the union was certified as their exclusive bargaining representative. It was Norton, not the UFW, who provided as a condition of employment the fringe benefits heretofore indicated. Norton having established the conditions of employment could not lawfully change them without giving the UFW notice and an opportunity to bargain about such a change.

The Board's conclusion that Norton violated section 1153, subdivisions (a) and (e), of the act by removing the kitchen utensils from its Salinas labor camp and changing the manner in which the labor camp residents paid for their food without giving the union notice or opportunity to bargain about these changes in working conditions is affirmed.

### REFUSAL TO REHIRE ARIZONA AND NEW MEXICO WORKERS

We are next asked to determine whether a finding of unfair labor practices against Norton can result in a remedial order directly affecting the Arizona and New Mexico fields. Preliminarily, we note that Norton's headquarters is in Arizona. Permanent records and checks are issued from the Arizona office despite the existence of branch offices in California. As indicated, Norton's operations involve agricultural fields in California, Arizona and New Mexico. The different crops and different seasons allow Norton to operate a circuit harvesting system. Generally, while the harvesting season in one field is running down, it is just beginning in another. This allows employees to follow the circuit. In fact, it appears Norton encourages such activity. Despite the existence of fields in Arizona and New Mexico, approximately 10 months of the year Norton's harvesting operations occur in California.

Clearly, were this a question of minimum contacts, Norton would be found to have established sufficient contacts rendering it susceptible to an in personam judgment in California. However, we do not view the issue as whether there were sufficient minimum contacts in California.

The nature of the circuit harvesting and the existence of fields outside of California present somewhat of a unique question of how far a state may go to reach extraterritorial activities. The suggested scenerio is as follows: The

1979 Salinas activities are the basis upon which subsequent rehire of certain employees was denied. Assuming the activities in Salinas were condoned by Norton, there would be no justification to refuse rehire if the sole reason for such refusal is based on the condoned activity. The UFW would have the burden of proving Norton engaged in a policy of rehiring former employees. Next, it would have to establish that these employees had presented themselves for rehire in these other states or an exception existed eliminating this requirement. Next, the UFW would have to establish the refusal to rehire was as a result of the 1979 Salinas activities. Assuming all of the above has been established, the issue becomes whether the ALRA can reach Norton's failure to rehire these employees in Arizona and New Mexico.

There is obviously no problem in finding an unfair labor practice, assuming the above prerequisites have been established, with respect to the California fields. It is quite another question, however, as to whether unfair labor practices can properly be found in Arizona and New Mexico in this instance. The UFW contends "if Norton were permitted to get away with its discriminatory refusals of work in this case, there would be nothing to keep it from completely purging the ranks of its agricultural workers of anyone who dares to engage in union activity, each time the company's operations temporarily cross state lines." Initially, we question the validity of such a statement. If in fact Norton's operations involve harvesting in California 10 out of the 12 months, it would be practically impossible for Norton to purge its ranks merely by refusing to hire those employees the remaining 2 months.

While there is no direct authority upon which to base a conclusion, both sides cite to us *Alaska Packers Assn.* v. *Industrial Accident Com.* (1935) 294 U.S. 532 [79 L.Ed. 1044, 55 S.Ct. 518] and *United Farm Workers* v. *Arizona Agr. Employment* (9th Cir. 1982) 669 F.2d 1249. In the *Alaska Packers* case, a nonresident alien was hired by a company doing business in California to work in Alaska during the salmon canning season. The contract was entered into in San Francisco. While in Alaska the employee suffered injuries which resulted in an award under the California Workers' Compensation Law. The court first concluded that because the contract was entered into in California, the fact that the injury occurred outside of the state does not preclude California state control. (294 U.S. at pp. 540-541 [79 L.Ed. at p. 1048].) The court then stated that "while similar power to control the legal consequences of a tortious act committed elsewhere has been denied ... the liability under Workmen's Compensation Acts is not for a tort. It is imposed as an incident of the employment relationship, as a cost to be borne by the business enterprise, rather than as an attempt to extend redress for the wrongful act of the employer." (*Id.,* at p. 541 [79 L. Ed. at pp. 1048-1049].) The court continued: "Obviously the power of the state to affect

legal consequences is not limited to occurrences within the state if it has control over the status which gives rise to those consequences. [The state] has power, through its own tribunals, to grant compensation to local employees, locally employed, for injuries received outside its borders, and likewise has power to forbid its own courts to give any other form of relief for such injury. . . ." (*Ibid.* [79 L.Ed. at p. 1049].) We find a large distinction between a Workers' Compensation award, which is imposed as an incident of employment and not for the wrongful act by the employer, and the type of award which is requested in this case. ■■■ A ruling that Norton must continue hiring workers engaged in the 1979 Salinas activities would control the hiring practices of an out-of-state employer, employing out-of-state workers, working in out-of-state employment and oversteps state authority.

*United Farm Workers* also supports the conclusion that the award of this court must be limited only to the California field. The employer in that case operated fields in both California and Arizona. Approximately 90 percent of all its employees worked in both states' fields. In 1976 the UFW was elected the sole bargaining agent for all employees "excluding those who worked exclusively outside the State of California." Some four years later a bargaining representative in Arizona attempted to organize the Arizona employees. The UFW objected, contending that they represented all of the employees. The purpose of this objection was to preclude any sort of election from occurring in Arizona. The argument was based on the notion that Arizona would have to give full faith and credit to the California proceeding which elected the UFW as the sole bargaining agent. Were that the case, then another election would obviously not be possible. The court concluded that "a union representation election in Arizona would not offend the dictates of full faith and credit." (669 F.2d at 1255.) Hence, the Arizona employees are entitled to elect their own representative to represent them with respect to the activities occurring in the Arizona fields. The clear import of this decision is that the UFW, elected as the bargaining agent in California, could not represent those employees concerning actions which occurred in the Arizona fields. Were it otherwise, the mere fact of having minimum contacts in one state would allow the ALRA extraterritorial power. Mass confusion would result, especially where the other state involved has an Agricultural Labor Relations Act of its own.

Turning to the situation at hand, we conclude that Norton's failure to rehire those 1979 Salinas employees in Arizona and New Mexico cannot be remedied by the ALRB. Those aggrieved employees have a forum in Arizona and/or New Mexico in which to present their claims. In order to avoid a conflict, we find the better approach is to allow those other states to make independent determinations as to whether these aggrieved employees would

be subject to some sort of remedy as a result of Norton's failing to rehire in those individual states.

The Board's order finding Norton violated the ALRA by failing to rehire Salinas workers in Arizona and New Mexico is annulled.

THE BOARD'S ORDER 8 ALRB NO. 76

J & L FORMULA

 The Board issued a back-pay order based on the formula established in *J & L Farms* (1980) 6 ALRB No. 43. Our Supreme Court in *Nish Norian Farms* v. *Agricultural Labor Relations Bd.* (1984) 35 Cal.3d 726, 744 [201 Cal.Rptr. 1, 677 P.2d 1170], approved the *J & L Farms* formula, allowing computation of back-pay awards on a daily basis, as a general principle. We are bound by this determination. We adopt and support the Supreme Court's ground rules for fair application of the daily formula.

"That a 'daily' formula is a proper rule of thumb, however, does not mean it may fairly be applied in an identical manner to all situations. It would be unfair not to offset wages from true substitute employment, even if the new work is performed on different weekdays, or even in different seasons, than was the unlawfully terminated job. For example, if an agricultural employee replaced a steady full-time Wednesday-Sunday job with similar full-time Thursday-Tuesday work under circumstances indicating the latter position was a true substitute for the former, his Monday and Tuesday wages in the new position should not be exempt from offset.

"The Board concedes that, in the supplementary backpay proceedings, the employer may introduce evidence of the discharged employee's work history. The *Sunnyside-J & L Farms* formula will then be applied equitably to the facts adduced.

"*Mario Saikhon, Inc.* (1983) 9 ALRB No. 50 illustrates the Board's policy. There the Board calculated backpay for an unlawfully discharged Imperial Valley lettuce worker. The prior remedial order had called for back wages computed under the *Sunnyside* formula. (*Mario Saikhon, Inc.* (1979) 5 ALRB No. 4, p. 6, fn. 5.)

"However, the Board reviewed the employee's particular work history to determine how the formula should be applied to his case. He had established a pattern of working steadily and full-time during the Imperial Valley lettuce season but taking the rest of the year off. After his discharge, he moved permanently to Salinas, where lettuce is harvested at a different time

of year. There he resumed his pattern of full-time single-season employment in lettuce. The Board concluded that the subsequent employment, though it occurred only during days and seasons when the employee would not have worked for his former employer, was a substitute for the prior. It therefore ordered an offset against back pay. (9 ALRB No. 50, pp. 5-6.)" (35 Cal.3d at p. 746.)

After the Board has reviewed the discharged employee's work history to determine how the formula should be applied, Norton could introduce evidence of the employee's employment history. The Board could then determine whether any interim wages earned during days of the week other than those on which the employee would work for Norton are true substitutes for the back-pay loss. The Board by equitably tailoring the formula to the particular facts of the case at hand can easily avoid any unfair award.

## Lu-Ette Formula

Having disposed of Norton's claim concerning the computation of back-pay on a daily basis, we now turn to the propriety of the Board's order fixing interest on back-pay awards utilizing the *Lu-Ette* formula. The Board here as in *Lu-Ette* found the National Labor Relations Board (NLRB) decision in *Florida Steel Corp.* (1977) 231 NLRB 651, to be applicable precedent for fixing interest rates on back-pay obligations.

The NLRB had previously established a flat six percent rate of interest in 1962, in *Isis Plumbing & Heating Co.* (1962) 138 NLRB 716. In *Florida Steel, supra,* the Board noted that the flat six percent interest rate no longer effectuated the policies of the act because of the effects of inflation, and concluded that a rate of interest more accurately keyed to the private sector money market would encourage timely compliance with NLRB orders, discourage the commission of unfair labor practices, and more fully compensate discriminatees for economic losses. It therefore adopted the sliding interest scale charged or paid by the Internal Revenue Service on the underpayment or overpayment of federal taxes as the appropriate rate of interest on its orders.[3]

---

[3] 26 United States Code section 6621 provides:

"(a) In General.—The annual rate established under this section shall be such adjusted rate as is established by the Secretary under subsection (b).

"(b) Adjustment of Interest Rate.—

"(1) Establishment of adjusted rate.—If the adjusted prime rate charged by banks (rounded to the nearest full percent)—

"(A) during the 6-month period ending on September 30 of any calendar year, or

"(B) during the 6-month period ending on March 31 of any calendar year, differs from the interest rate in effect under this section on either such date, respectively, then the Secretary

■ The Board cites as additional reasons for adopting *Florida Steel* that back-pay awards should further a two-fold objective: (1) The backpay remedies are to reimburse the innocent employee for the actual loss which he has suffered as a result of the employer's improper conduct and (2) the order should further the public interest advanced by the deterrence of such illegal acts.

Turning to the last contention first, the Board contends that because the *Florida Steel* rate is keyed to the private money market, it would more closely reflect the actual cost of money to the employer. The employer in effect would be paying an interest rate conditioned on the current money market rather than a low, unrealistic fixed rate. A realistic rate of interest on back-pay awards would tend to encourage voluntary settlement of disputes and discourage dilatory tactics by employers. There is little doubt a realistic interest rate keyed to periodically reflect adjusted changes in the private money market would more adequately compensate the innocent employee for losses suffered as a result of the employer's improper conduct.

Norton contends the Board's adoption of a sliding interest rate conflicts with California's constitutional limitation on interest rates. Not so.

Article XV, section 1, of the California Constitution provides in pertinent part as follows:

"The rate of interest upon the loan or forbearance of any money, goods, or things in action, or on accounts after demand, shall be 7 percent per annum ....

". . . . . . . . . . . . . . . . . . .

"The rate of interest upon a judgment rendered in any court of this state shall be set by the Legislature at not more than 10 percent per annum. Such rate may be variable and based upon interest rates charged by federal agencies or economic indicators, or both.

---

shall establish, within 15 days after the close of the applicable 6-month period, an adjusted rate of interest equal to such adjusted prime rate.

"(2) Effective date of adjustment.—Any adjusted rate of interest established under paragraph (1) shall become effective—

"(A) on January 1 of the succeeding year in the case of an adjustment attributable to paragraph (1)(A), and

"(B) on July 1 of the same year in the case of an adjustment attributable to paragraph (1)(B).

"(c) Definition of Prime Rate.—For purposes of subsection (b), the term 'adjusted prime rate charged by banks' means the average predominant prime rate quoted by commercial banks to large businesses, as determined by the Board of Governors of the Federal Reserve System."

"In the absence of the setting of such rate by the Legislsture, the rate of interest on any judgment rendered in any court of the state shall be 7 percent per annum."

A back-pay award is not a "loan or forbearance," "account on demand" or "judgment rendered in any court of this state" within the meaning of the constitutional prohibition.

Norton does not contend that a back-pay award is a loan or forbearance or account on demand but does argue that the constitutional limitation of interest rates on judgments applies to the Board order.

The constitutional provision is limited on its face to *judgments* rendered by *courts of this state*.

Article VI of the Constitution which establishes the courts of the state provides that the judicial power of the state is vested in the Supreme Court, Courts of Appeal, superior courts, municipal courts and justice courts. The fact that an administrative board exercises some quasi-judicial functions does not convert the board into a court of the state and does not convert its orders into judgments.

A judgment is defined in section 577 of the Code of Civil Procedure as "the final determination of the rights of the parties in an action or proceeding" and action is defined as "an ordinary proceeding in a *court of justice* . . . ."

The analogy the petitioner seeks to draw between a back-pay award and a money judgment has been rejected by at least one case in the California Court of Appeal.

In *Perry Farms, Inc.* v. *Agricultural Labor Relations Bd.* (1978) 86 Cal.App.3d 448, 464 [150 Cal.Rptr. 495], petitioners claimed that they were entitled to a jury trial because the proceedings before the ALRB resulted in a recovery in a form analogous to a money judgment. The court rejected this argument on two grounds, namely, that (1) the constitutional grant of authority to the Board (Cal. Const. Art. XIV, § 1) worked as a pro tanto repeal of any conflicting constitutional provisions, and (2) the ALRB proceedings "are *neither civil actions* nor proceedings known to the common law and absent a statute providing for a jury trial in such proceedings, no such right exists."(Italics added.) (See also *Labor Board* v. *Jones & Laughlin Steel Corp.* (1937) 301 U.S. 1, 48 [81 L.Ed. 893, 917-918,57 S.Ct. 615, 629].)

Absent some constitutional or statutory limitation on the interest rate to be allowed on ALRB back-pay awards, this court should not disturb the ALRB remedial order unless it is shown that the order is an attempt to achieve ends other than those reasonably calculated to effectuate the policies of the act. (See *Butte View Farms* v. *Agricultural Labor Relations Bd*. (1979) 95 Cal.App.3d 961, 967 [157 Cal.Rptr. 476].) There has been no such showing made in this case.

As previously noted, an interest rate derived from current business practices more adequately compensates the victims of unfair labor practices and tends to encourage voluntary settlement of disputes and discourages dilatory tactics.

The *Lu-Ette* interest formula satisfies the purposes of the act. Therefore, its adoption by the Board was proper.

We have considered all other claims of error asserted by Norton and find them without merit.

## II

### 9 ALRB No. 18

#### REFUSAL TO REHIRE AGUIRRE AND SANCHEZ

The ALJ found the General Counsel did not prove by a preponderance of the evidence the refusal to hire or rehire Aguirre and Sanchez was causally connected with their union activities and in violation of section 1153, subdivisions (a) and (c), of the act. The Board reversed the ALJ's finding based largely on the evidence received in *J. R. Norton Company* (1982) 8 ALRB No. 76, and concluded Norton's refusal to rehire Aguirre and Sanchez resulted from their union activities and was in violation of section 1153, subdivisions (a) and (c), of the act.

 It is highly doubtful that the Board was at liberty to consider the evidence adduced in *J. R. Norton Company* (1982) 8 ALRB No. 76, in view of the Board's failure to comply with the restrictions contained in section 1160.3. Section 1160.3 provides in relevant part: "Testimony taken by such a member, agent, or agency, or the Board in such hearing shall be reduced to writing and filed with the Board. Thereafter, in its discretion, the Board, upon notice, may take further testimony or hear argument." The Board did not at any time give notice of its intention to take or consider additional evidence. Even if the Board's consideration of the testimony in *J. R. Norton Company* (1982) 8 ALRB No. 76, was proper, the finding that Aguirre and

Sanchez were refused rehire due to union activities is not supported by substantial evidence. The Board's decision can be supported, if at all, by relating the work stoppages occurring during Norton's Salinas' lettuce harvest in 1979 to Aguirre and Sanchez. Aguirre and Sanchez did not work in Salinas and were not engaged in any work stoppage. They had worked only in the Blythe and Imperial Valley harvest in prior years. Aguirre had been a union organizer at Norton in 1975 and had passed out union literature in 1977-1978. He had not engaged in recent union activities. The ALJ found Aguirre was not very convincing when he testified on the amount of his union activities and the record did not reflect much activity beyond December 1978. Sanchez did not participate in any direct support for the UFW but did talk to coworkers during lunch hours about UFW benefits. When Aguirre applied for work in the October 1979 Blythe harvest, he was with a group of former Salinas workers who had been denied rehire in New Mexico. When Sanchez applied for work in the Blythe harvest, he was not with former Salinas workers. Sanchez applied on the same day Aguirre was denied employment. The Board found because Aguirre was identified with former Salinas workers he was denied rehire. Sanchez was denied rehire because of Norton's previous antiunion animus.

■ General Counsel carries the burden of proving the elements of an unfair labor practice. (*NLRB* v. *Transportation Management Corp.* (1983) 462 U.S.393, 400-401 [76 L.Ed. 2d 667, 674, 103 S.Ct. 2469, 2474].) The General Counsel's burden in a refusal-to-rehire case is set forth in *Ukegawa Brothers, Inc.* (1982) 9 ALRB No. 26: "To establish a prima facie case of discriminatory refusal to rehire, General Counsel must show by a preponderance of the evidence that the individual engaged in protected activity, that Respondent had knowledge of such activity and that there was some causal relationship between the protected activity and the failure to rehire. If a violation of Section 1153(c) is alleged, General Counsel is additionally charged with showing by a preponderance of the evidence that Respondent's conduct had an object of discouraging membership in a labor organization. In proving his prima facie case, General Counsel must customarily show that work was available at the time the discriminatee applied and that Respondent's policy was to rehire former employees." (Fns. omitted.)

■ The record, considered as a whole, fails to demonstrate any causal relationship between the protected activity and the failure to rehire either Aguirre or Sanchez. "[The] finding of discrimination by the Board must be supported by substantial evidence; it may not rest upon flimsy evidence, mere inference or guesswork." (*Independent Gravel Co.* v. *N.L.R.B.* (8th Cir. 1977) 566 F.2d 1091, 1094.) The Board's finding of a causal connection between the protected activity and the failure to rehire Aguirre and Sanchez

rests entirely on inference and guesswork and is not supported by substantial evidence and must be annulled.

## REFUSAL TO REHIRE JOSE ESPINOZA

Espinoza was first employed by Norton in August 1979 and laid off in March 1980. During that time, he worked under foreman Cardenas as a sprinkler, shoveler and irrigator and under foreman Silva as a tractor driver. After Espinoza was laid off as a tractor driver by Silva, he went back to work for Cardenas as a shoveler but was laid off one week later with the other shovelers. Espinoza was considered a good and versatile worker. Espinoza's union activities consisted of signing a petition asking Norton to negotiate with the UFW, wearing a union button during January 1980, and attending union meetings at a union hall in Calexico. Norton was aware of Espinoza's union activities. When Espinoza reapplied for work through foreman Cardenas, he was advised they could not employ him any longer because of his union activities and he could have remained full time because he knew how to do everything but the general foreman did not want him there. After this conversation with Cardenas in April, Norton hired new tractor drivers in June and in August. The record does not establish that Espinoza made application when work was available. The above facts provide substantial evidence to support a finding Espinoza was discriminatorily refused rehire. Norton's foreman's statement Espinoza would be refused rehire because of his union activities establishes that is the reason for not rehiring Espinoza. Even though the evidence does not show a continued effort on Espinoza's part to become reemployed by Norton when work was available, Cardenas' statement to Espinoza that he could not employ him any longer because he was involved with the union demonstrated any application by Espinoza for rehire would be an exercise in futility. The Board's finding of an unfair labor practice for refusal to rehire Espinoza is affirmed.

## INTERROGATION AND THREATS REGARDING JIMINEZ'S UNION ACTIVITIES AND DISCRIMINATION FOR FILING AN ALRB CHARGE

Jiminez, an irrigator for Norton, was a member of the UFW negotiating committee. On March 4, Zermeno, another irrigator, was discharged by Norton. Zermeno filed an unfair labor practice against Norton as a result of this discharge. On March 5, Jiminez took Zermeno's unfair practice labor charge to Norton's foreman Cardenas. Cardenas stated at that time he did not know that Jiminez belonged to the union. On March 6, Jiminez was assigned harder work and Cardenas sent him to irrigate field No. 26 consisting of 90 acres easily requiring two persons to irrigate. As a result of this assignment, Jiminez filed an unfair labor charge against Cardenas and handed it to him. Cardenas angrily approached Jiminez and asked him if he

were planning to file charges every day and pointed out Jiminez neglected to ask for any help. Jiminez replied it would not have done any good because Cardenas would still mistreat the employees. Cardenas responded, "From now on we shall see. It's going to be different with you." The ALJ found Cardenas made the three statements attributed to him and discriminated against Jiminez as a result of filing the unfair labor practice charge on behalf of Zermeno. The ALJ evaluated Cardenas's remarks as follows: Cardenas's statement, "I didn't know you belonged to the union" illustrated knowledge on behalf of Cardenas that Jiminez was an active union supporter. Cardenas's statement whether Jiminez intended to file charges daily was made in anger and sarcastically criticizing the filing of these charges is no different than threatening or questioning an employee about them. The intended effect is the same, restraining the employee from filing charges in the future. Cardenas's remark, "It's going to be different with you in the future," was found to be clearly a threat of discriminatory treatment directed at Jiminez as a result of Cardenas's anger over Jiminez's filing an unfair labor practice charge. Threatening an employee with dire consequences for his exercise of protected rights is a violation of the act. The ALJ then found that when Jiminez filed with Cardenas a copy of an unfair labor practice charge on behalf of Zermeno, Cardenas gained knowledge of Jiminez's union support and activity and that as a result of that knowledge Cardenas assigned Jiminez extra work in field No. 26. The ALJ concluded the threats and discriminatory assignment of extra work constituted violations of section 1153, subdivisions (a), (c) and (d), of the act, and the Board affirmed the ALJ's conclusion.

 Norton argues the ALJ and the Board improperly credited Jiminez's testimony. We are required to accept the Board's credibility resolutions and any derivative finding unless it has chosen to credit testimony which is incredible or inherently improbable. (See *Montebello Rose Co.* v. *Agricultural Labor Relations Bd.* (1981) 119 Cal.App.3d 1, 20 [173 Cal. Rptr. 856].) The Board's credibility resolutions and derivative findings provide substantial evidence to support the violations of sections 1153, subdivisions (a), (c) and (d), of the act in this instance.

### SURVEILLANCE OF UNION ACTIVITIES BY ROMAN

Between 6:30 and 7 a.m., David Valles (Valles) went to the Shell Station in Calexico where Norton's buses picked up workers. This occurred either in January or February of 1980. Valles proposed to speak to lettuce workers about forming a negotiating committee to receive their ideas regarding contract proposals. Valles had previously had a conversation with supervisor Al Pena at the Calexico pick-up point. This occurred in early January

1980, the day the harvest started. Valles told Pena he would be coming out to talk to workers about negotiations. Pena made no response.

On the day Valles came out to speak to the workers, he was accompanied by Jesus Silva (Silva) and a number of other employees.[4] Valles testified these people accompanied him to the buses that morning to organize.

Valles testified he was wearing a UFW identification badge. He stated he had boarded several of Norton's buses and asked the foremen to disembark which they did. Valles then spoke to the workers inside each bus. When Valles reached the bus driven by Roman, he encountered a problem. Valles requested Roman get out of the bus so he could speak with the workers. Valles explained to Roman that he was with the UFW and that the union was informing workers of the start of negotiations and he wanted to elicit ideas from them. Valles testified that Roman's reply to this was, "Well, I'm not going to get off the bus. I'm not going to get off the bus until the company tells me to get off the bus." Valles testified he told Roman he had the right to talk to the workers without surveillance of the foreman because the workers would not feel free to ask questions if the foreman were around. Roman refused to exit the bus. Valles decided to go ahead and talk to the workers anyway. There were approximately 15 to 20 persons on the bus at this time. Roman remained seated in the driver's seat the whole time and according to Valles made remarks to the effect that there ought to be another election. No workers volunteered to respond following Valles' speech. The buses departed around 7 a.m.

The Board affirmed the ALJ's finding Valles had efficiently complied with the postcertification access guidelines to validate his attempt to communicate with Norton's workers on board Roman's bus. This finding is not supported by substantial evidence. The Board in *O. P. Murphy Produce Co., Inc.* (1978) 4 ALRB No. 106, commented on and set forth the guidelines for taking postcertification access: "We have noted that the right of post-certification access is based upon quite different justifications than pre-election access, and that allegations of denials of reasonable access during contract negotiations will be evaluated on a case-by-case approach. We also believe the following guidelines to be appropriate. The purpose for taking access must be related to the collective bargaining process. Absent unusual circumstances, the labor organization must give notice to the employer and seek his or her agreement before entering the employer's premises. The labor organization must give such information as the number and names of the representatives who wish to take access, and the times and locations of

---

[4] Valles indicated these were former Norton employees and members of the negotiating committee. Some of them may have been refused rehire after the Salinas work stoppage.

such desired access. The parties must act in good faith to reach agreement about post-certification access.[2] " The right of access does not include conduct disruptive of the employer's property or agricultural operations.

Valles's testimony that he told supervisor Pena he would be coming out to talk to the workers about negotiations coupled with Pena's failure to respond falls far short of complying with the guidelines heretofore set forth. The testimony of Valles does not point to any exceptional or extraordinary circumstances indicating that deviation from the guidelines was warranted. The guidelines imposed no hardship on Valles's effort to speak to the workers. Valles could have easily contacted Norton before his arrival on this morning indicating his time of arrival and the number and names of the persons who would take access and obtain Norton's agreement.

Valles's arrival without the appropriate contact could have promoted violence. The obvious purpose of the guidelines is to give notice to prevent violence. Valles and Roman handled this confrontation without violence. However, other parties could well have reacted differently. The fact that physical confrontation did not occur is fortuitous. Compliance with the guidelines to obtain postcertification access comports with the policies of the act to promote peace in the fields. Valles's unannounced arrival demanding to be allowed to board Norton's buses runs contra to this policy. Failure of Valles to comply with the regulations to take postcertification access places him in no better position than an officious intermeddler. Roman's refusal to leave the bus was justified. The Board's finding Roman's refusal to leave the bus constituted an interference and surveillance is annulled.

THE BOARD'S ORDER 9 ALRB No. 18

Norton contends the remedial order issued by the Board was punitive because it required an excessive number of mailings and applied the *Lu-Ette Farms* (1980) 8 ALRB No. 55 interest rates to back-pay awards.

Above, we concluded the Board's determination that Norton committed unfair labor practices by failing and refusing to rehire Aguirre and Sanchez and by engaging in surveillance of union activities by Norton's foreman Roman is contrary to law and not supported by substantial evidence. It is, therefore, appropriate to remand the matter to the Board for redetermination of its mailing order.

---

"[2] It is preferable that in fulfilling their duty to bargain in good faith the parties reach agreement among themselves concerning access. However, in order to negotiate access agreements, the parties may request the aid of the Regional Director and Board Agents."

On remand the Board will have the opportunity to reconsider the appropriateness of its order requiring Norton to mail notices to all its agricultural employees covering a time span in excess of four years.

 The Board's power to make remedial orders in unfair labor practice cases derives from section 1160.3 which provides in part: "If, upon the preponderance of the testimony taken, the board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, the board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, [and] to take affirmative action ... when the board deems such relief appropriate ...." The parallel provision of the National Labor Relations Act (NLRA) (§ 10(c), 29 U.S.C. § 160(c)) is similarly worded, and California courts have treated federal decisions under that provision of the NLRA as persuasive precedent with respect to the propriety of remedial orders of the Board under ALRA. (See, e.g., *J. R. Norton Co.* v. *Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1, 39 [160 Cal.Rptr. 710, 603 P.2d 1306]; *Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335, 355 [156 Cal.Rptr. 1, 595 P.2d 579]; *Pandol & Sons* v. *Agricultural Labor Relations Bd., supra,* 98 Cal.App.3d at pp. 587-589; *Sunnyside Nurseries, Inc.* v. *Agricultural Labor Relations Bd., supra,* 93 Cal.App.3d at p. 940.)

The federal decisions as well as recent decisions of the California Courts of Appeal establish that because the relation of remedy to policy is peculiarly a matter of administrative competence, the Board must be given relatively free reign in determining which remedy would effectuate policies of the Act. (E.g., *Phelps Dodge Corp.* v. *Labor Board* (1941) 313 U.S. 177, 194 [85 L.Ed. 1271, 1283, 61 S.Ct. 845]; *Pandol & Sons* v. *Agricultural Labor Relations Bd., supra,* 98 Cal.App.3d at pp. 588-589; see *Fibreboard Corp.* v. *Labor Board* (1964) 379 U.S. 203, 216 [13 L.Ed.2d 233, 241-242, 85 S.Ct. 398, 6 A.L.R.3d 1130].) Nevertheless, the Board's discretion in ordering affirmative action to remedy unfair labor practices "is not unbounded. It must be exercised reasonably by the Board whose 'power to command affirmative action is remedial, *not punitive,* ...'" (*Sunnyside Nurseries, Inc.* v. *Agricultural Labor Relations Bd., supra,* 93 Cal.App.3d at p. 940, quoting in part from *Edison Co.* v. *Labor Board* (1938) 305 U.S. 197, 236 [83 L.Ed. 126, 143, 59 S.Ct. 206], italics in original.) When the order of the Board is so severe in comparison to the conduct involved in the unfair labor practice that it is clearly punitive in character, the order will be annulled. (*Sunnyside Nurseries, Inc.* v. *Agricultural Labor Relations Bd., supra,* 93 Cal.App.3d at p. 940.)

 The Board's mailing order is annulled and remanded to the Board for reconsideration.

The propriety of using the *Lu-Ette* interest formula to compute interest on back-pay awards has already been disposed of and requires no additional discussion.

DISPOSITION

8 ALRB No. 76

The Board's order the refusal to rehire Crew W constitutes an unfair labor practice is affirmed as to crew members Ramirez, Lujan and Lerma and annulled as to all other Crew W members.

The Board's order finding Norton violated the ALRA by threatening De La Fuente is annulled.

The Board's order finding Norton violated the ALRA by refusal to rehire the Arizona and New Mexico workers is annulled.

In all other respects, the Board's orders are affirmed.

9 ALRB No. 18

The Board's order finding Norton violated the ALRA by refusing to rehire Aguirre and Sanchez is annulled.

The Board's order finding Norton violated the ALRA by surveilling union activities during postelection access is annulled.

The Board's mailing order is annulled and remanded to the Board for reconsideration.

The Board's orders in all other respects are affirmed.

Morris, J., concurred.

KAUFMAN, J.,Concurring and Dissenting.—I concur in the judgment and in all portions of the opinion except those portions of part I dealing with the res judicata effect to be given the finding of condonation in the decision in 8 ALRB No. 89 and dealing with the *Lu-Ette* formula. As to those portions of part I, I dissent.

*Res Judicata*

I do not agree either (1) that it is necessary to decide whether a res judicata effect is to be given to the condonation finding in 8 ALRB No. 89

or (2) that if that question were reached, any res judicata effect should be given that decision in this review.

First, as I understand it, the majority purports to treat as res judicata only the employer's asserted condonation of the 1979 Salinas work stoppage. Otherwise, the majority concludes there is no substantial evidence of several other elements necessary to a determination of an unfair labor practice on the basis of the employer's failure to rehire the 1979 work stoppage participants. Since substantial evidence is lacking as to several of the other necessary elements, there is no need to decide that the condonation finding in 8 ALRB No. 89 is to be treated as res judicata. It need only be said that "assuming arguendo condonation of the 1979 Salinas work stoppage is established by res judicata, there is no substantial evidence of several other elements necessary to a determination of an unfair labor practice."

Secondly, were the res judicata question properly reached, in the unique circumstances presented here I do not believe it proper to give any res judicata effect to the decision in 8 ALRB No. 89. Although it makes no difference to the outcome of this particular case, giving res judicata effect to the decision in 8 ALRB No. 89 produces the anomalous and unacceptable result that as to one significant issue, a decision by the Board ousts this court of its statutory duty and authority to review another decision of the board in a case in which this court had already assumed jurisdiction and undertaken to review the matter before the other Board decision became final and in which finality resulted not from review on the merits but by virtue of the discretionary denial by another Court of Appeal of a writ of review. Such a possibility is but an invitation to mischief.

The doctrine of res judicata, including the principle of collateral estoppel, is a judicially created mechanism to avoid burdening the administration of justice with multiple litigation of the same dispute or of the same issue between disputants. When in a rare circumstance the doctrine comes into irreconcilable conflict with more important public policies, it must give way. (*Greenfield* v. *Mather* (1948) 32 Cal.2d 23, 35 [194 P.2d 1] [questioned but not overruled in *Slater* v. *Blackwood* (1975) 15 Cal.3d 791, 796 (126 Cal.Rptr. 225, 543 P.2d 593)]; *Hight* v. *Hight* (1977) 67 Cal.App.3d 498, 503-504 [136 Cal.Rptr. 685].)

Original and final jurisdiction, except for the possibility of the grant of a hearing in the California Supreme Court, over review of final decisions of the ALRB is vested in the California Courts of Appeal. (Lab. Code, § 1160.8.) Such original and exclusive jurisdiction to judicially review the decisions of an administrative agency import a measure of responsibility to guard against arbitrary administrative action and insure fair and reasonable

administrative decisions. (See *Universal Camera Corp.* v. *Labor Bd.* (1951) 340 U.S. 474, 489-490 [95 L.Ed. 456, 468, 71 S.Ct. 456]; *George Arakelian Farms, Inc.* v. *Agricultural Labor Relations Bd.* (1980) 111 Cal.App.3d 258, 266 [168 Cal.Rptr. 537]; *Sunnyside Nurseries, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 93 Cal.App.3d 922, 930-931 [156 Cal.Rptr. 152]; see also *J. R. Norton Co.* v. *Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1, 32-33 [160 Cal. Rptr. 710, 603 P.2d 1306].) This judicial check on the possibility of arbitrary administrative action is far more significant to the administration of justice than invariable adherence to the judicially created doctrine of res judicata.

### The Lu-Ette Formula

The majority concludes that a provision for interest on back wages ordered in a make-whole order is not a judgment, notes that the employer does not contend "that a back-pay award is a loan or forbearance or account on demand [*sic*]," and holds that therefore the constitutional limitation on interest rates applicable to all other persons and agencies in this state unless expressly exempted (Cal. Const., art. XV, § 1, subd. (2)) does not apply to the rate of interest an employer may be ordered to pay on a back-pay award. I agree that the interest here involved is not interest on a judgment. However, whether contended or not, I am not at all certain that interest on an award of back wages is not a "forbearance of any money, goods, or things in action" as those words have been expansively interpreted by the decisions. In any event, however, I am thoroughly persuaded that the allowable rate of interest an employer may be ordered to pay in connection with a back-pay award made as part of a make-whole order is the legal rate binding on all other persons and agencies in the state not expressly exempted.

This is so for two reasons: (1) because the interest on a back-pay award is nothing more or less than prejudgment interest which is limited in this state to the legal rate; and (2) because a make-whole order must be designed to make the employee whole, not to give to the employee more than he or she would have received in the absence of the unfair labor practice and not to punish the employer.

The interest ordered on a back-pay award from the time of the unfair labor practice to the time of the make-whole order is clearly prejudgment interest. (See *Mass* v. *Board of Education* (1964) 61 Cal.2d 612, 624-625 [39 Cal.Rptr. 739, 394 P.2d 579]; Civ. Code, § 3287, subd. (a).) The allowable rate of interest on prejudgment interest is the legal rate. (Cal. Const., art. XV, § 1, subd. (2); *McConnell* v. *Pacific Mutual Life Ins. Co.* (1962) 205 Cal.App.2d 469, 481 [24 Cal.Rptr. 5]; *In re Consol. Pretrial Proceedings in*

*Air West* (N.D. Cal. 1977) 436 F.Supp. 1281, 1286; *Cutten* v. *Allied Van Lines, Inc.* (C.D. Cal. 1972) 349 F.Supp. 907, 912-913, affd. 514 F.2d 1196.)

The Board's authority to make a back-pay order and, in turn, to order the payment of interest on back pay derives exclusively from Labor Code section 1160.3 which reads in relevant part: "If, upon the preponderance of the testimony taken, the board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, the board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, to take affirmative action, including reinstatement of employees with or without backpay, and making employees whole, when the board deems such relief appropriate, for the loss of pay resulting from the employer's refusal to bargain, and to provide such other relief as will effectuate the policies of this part." The Board's exercise of power to command affirmative action and to "provide such other relief as will effectuate the policies of" the ALRA must be remedial, not punitive. (*Sunnyside Nurseries, Inc.* v. *Agricultural Labor Relations Bd., supra,* 93 Cal.App.3d at p. 940, quoting in part from *Edison Co.* v. *Labor Board* (1938) 305 U.S. 197, 236 [83 L.Ed. 126, 143, 59 S.Ct. 206].) "[I]t is not enough to justify the Board's requirements to say that they would have the effect of deterring a person from violating the Act. That argument proves too much, for if such a deterrent effect is sufficient to sustain an order of the Board, it would be free to set up any system of penalties which it would deem adequate to that end. [¶] ... [A]ffirmative action to 'effectuate the policies of this Act' is action to achieve the remedial objectives which the Act sets forth." (*Republic Steel Corp.* v. *Labor Board* (1940) 311 U.S. 7, 12 [85 L.Ed. 6, 10, 61 S.Ct. 77].)

There is no evidence of any kind that the value to the employees who are to be made whole of the loss of use of the wages of which they were deprived would amount to the rate of interest assessed against the employer under the *Lu-Ette* formula. Thus, the assessment of interest in accordance with that formula cannot be justified under the Board's make-whole power; the order is clearly punitive and, therefore, invalid. One must sympathize with the proposition that unfair labor practices are to be discouraged, but as the United States Supreme Court pointed out in *Republic Steel,* the Board is not authorized to impose penalties to deter unfair labor practices.

APPENDIX A

*Maria Ramirez's testimony:*

"Q. How long did you work for J. R. Norton Company in 1979?
"A. From the first day that the machine started until we were told that the machine had broken down.
"Q. Can you give us an approximate time—how much time was that?
"A. About three weeks.
"Q. Now, was the—if I understand correctly, were you laid off when the machine broke?
"A. They told us that they would call us back when the machine was fixed.
"Q. When you say 'they', who do you mean?
"A. The foreman. And in the office we went several times to ask when we would be called back.
"Q. Specifically, who was the foreman or foremen who told you that you were laid off?
"A. Jose, but I do not know his last name.
"A. Was this Jose a foreman?
"A. Yes.
" MR. SATO : Can we get a stipulation that the Jose named was a foreman in the wrapping crew in May of 1979?
" MR. HERSH : No. I don't know.
" MR. SATO : No?
" ADMINISTRATIVE LAW OFFICER WEISS : Could you describe Jose?
" THE WITNESS : (through Interpreter) Yes. He is a man that is not very tall or very short, and he is quite older."

"Q. Looking at the second page, is this your signature?
"A. Yes.
"Q. When you made this declaration, were you familiar with—I mean, was it near the time the events described happened?
"A. Yes.
"Q. Okay. Did Pena ever tell you that he was going to kill you?
"A. No.
"Q. How about Maria Perez? Did she ever tell you she was going to kill you?
"A. No.
"Q. And Jose Ramirez?
"A. No.
"Q. Did you—did you ever talk to Jose Ramirez after you stopped working for Norton?
"A. Yes.
"Q. And where was that?
"A. On Main.
"Q. Okay. Do you know if he was still working for the company?
"A. He told me that he was working in the ground crews.
" ADMINISTRATIVE LAW OFFICER WEISS : Who was that that she [sic] was working for?
" MR. HERSH : Jose Ramirez.
"Q. Did you ever ask Jose Ramirez if you could cut?
"A. Yes.
"Q. Okay. Did you ask him more than once?"

*Lerma's testimony:*

"Q. Now, at that time when Don Jose, your foreman, said this, do you remember if this was before or after the election for the crew representatives?

"A. It was before.

"Q. How long did you work for J. R. Norton Company in 1979?

"A. About three weeks.

"Q. What happened after those three weeks?

"A. They said that the machine had broken down. So then they said when the machine is fixed we will call you, and they took all our telephone numbers.

"Q. When you say—

"A. Of all of us.

"Q. Excuse me. When you say 'he', are you referring to the foreman, Don Jose?

"A. Yes, Mr. Jose.

"Q. Were you ever called back?

"A. No.

"Q. Did you ever go back and ask for your job?

"A. Yes.

"Q. When?

"A. At the time that they gave us our last check after the machine was broken down, I went to the office and I said to the secretary—I don't know English, but I took my daughter to interpret for me, and I was told, 'There is no work now. The machine has not been fixed. You will be called.' I went about three times.

"Q. To the office?

"A. Yes.

"Q. At that time when the machine broke down, was the entire crew laid off?

"A. No.

"Q. How many—approximately how many of the crew were laid off?

"A. Only five or six persons were changed to another machine.

"Q. Did you ask your foreman why those people were changed to another machine?

"A. Yes.

"Q. And was this Don Jose?

"A. Yes.

"Q. And what did Don Jose say?

"A. That because they had more seniority—

"Q. Was there anything else he said at that time?

"A. No. He only said, 'I will call you when the machine is fixed.'

"Q. During the time that you were working for J. R. Norton in 1979, had you heard—were there other times that you heard your foreman mention the union, U.F.W.?

"A. Yes.

"Q. How many times was it—were there?

"A. One time when the representative had not gone, he got close to the conveyor belt to throw in the lettuce and he said, 'Don't you believe the union; we don't want union here. There's no union here. The company is not negotiating with anyone. You work in peace, and those of you that don't want to—'"

*Lujan's testimony:*

"Q. Now, when the machine broke, I think you testified you weren't on the machine when it broke, is that right?

"A. I don't recall.

"Q. When the machine broke, what happened? Were you sent home for the day or what?

"A. Yes. And Don Jose took our names and addresses and telephone numbers, and told us when the machine was fixed, he would call us.

"Q. Did he give you any idea as to when the machine might be fixed?

"A. He told us that in a week.

"Q. Did you talk to him again about it later?

"A. Yes.

"Q. When, how much later?

"A. On that Friday when they were coming so I could get my check, I asked him when the machine was going to start. And if it wasn't going to start up real quick, for him to give me that paper for unemployment.

"Q. This is what you said to him, now?

"A. Because I needed money to support my family, or my work. I needed one or the other.

"Q. What was your intention then, to apply for unemployment if the machine wasn't going to be fixed and you weren't going to be recalled?

"A. Yes.

"Q. So you asked for what, a layoff slip or termination slip of some kind?

"A. I never asked for unemployment, and I was not given the. . ."