[Civ. No. 41657. First Dist., Div. One. June 11, 1979.]

SUNNYSIDE NURSERIES, INC., Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO,
Real Party in Interest.

### COUNSEL

Littler, Mendelson, Fastiff & Tichy, Jordan L. Bloom, Michael J. Hogan and Lloyd W. Aubry, Jr., for Petitioner.

Harry J. Delizonna, Dennis M. Sullivan, Manuel M. Medeiros, Marvin J. Brenner, Tom Sobel and Elise Manders and Edwin F. Lowry for Respondent.

Jerome Cohen, Sanford N. Nathan, Tom Dalzell, Deborah Wiener Peyton, W. Daniel Boone, Glenn Rothner, E. Michael Heumann II, Linton Joaquin, Marco E. Lopez, Carlos M. Alcala, Francis E. Fernandez and Carmen S. Flores for Real Party in Interest.

### OPINION

**ELKINGTON, Acting P. J.**—We are here concerned with California's Agricultural Labor Relations Act (hereafter sometimes, the Act). The Act

is codified as Labor Code sections 1140-1166.3 and it became effective August 28, 1975. With near precision the several sections of the Act copy corresponding provisions of the National Labor Relations Act, found in 29 United States Code, commencing with section 151.

The Act provides for collective bargaining rights of agricultural workers, and it defines, proscribes, and provides sanctions for, certain unfair labor practices of agricultural employers. It charges the Agricultural Labor Relations Board (hereafter the Board) with the authority, and duty, to enforce the Act and to prevent agricultural employers from engaging in any of its enumerated unfair labor practices.

Labor Code section 1148 states: "The board shall follow applicable precedents of the National Labor Relations Act, . . ." (To the same effect see *Agricultural Labor Relations Bd.* v. *Superior Court,* 16 Cal.3d 392, 412 [128 Cal.Rptr. 183, 546 P.2d 687].)

Petitioner Sunnyside Nurseries, Inc. (hereafter Sunnyside) was an agricultural employer within the meaning of the Act, and it employed approximately 200 agricultural workers. After the effective date of the Act, United Farm Workers of America, AFL-CIO (hereafter the Union), was actively engaged in a campaign to enlist Sunnyside's agricultural workers in its membership, and to become their bargaining agent. Thereafter an election was held in which 89 votes were cast in favor of the Union, 80 votes were cast against any labor organization, and 14 votes for some undisclosed reason were not counted.

After the election the Union filed with the Board a written complaint that Sunnyside had committed the unfair labor practices denounced by Labor Code section 1153, subdivisions *(a) and (c).* Following a hearing before a hearing officer, the Board approved and adopted his findings that Sunnyside had violated Labor Code section 1153, subdivisions *(a), (b) and (c).*[1] By a final order the Board then adjudicated Sunnyside to

[1]Subdivisions (a), (b) and (c) of Labor Code section 1153 provide:

"It shall be an unfair labor practice for an agricultural employer to do any of the following:

"(a) To interfere with, restrain, or coerce agricultural employees in the exercise of the rights guaranteed in Section 1152.

"(b) To dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it. However, subject to such rules and regulations as may be made and published by the board pursuant to Section 1144, an agricultural employer shall not be prohibited from permitting agricultural employees to

have been guilty of those violations, and imposed upon it certain sanctions.

Sunnyside here seeks review and reversal of the Board's order. Its adversary parties on the review are the respondent Board and the real party in interest, the Union.

We proceed to our consideration of the contentions raised by the several parties.

## I.

Questions have arisen as to the constitutionality of the adjudicative powers vested in the Board by the Act, and the standard of review of the Board's decisions by the state's appellate courts.

The questions are answered by the recent case of *Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335 [156 Cal.Rptr. 1, 595 P.2d 579]. No unconstitutionality was there found in respect of the powers vested in the Board by the Act. **(1)** The proceedings for review are in the nature of an application for the extraordinary writ of review, or certiorari. **(2)** And the findings of the Board with respect to questions of fact will be sustained "if supported by substantial evidence on the record considered as a whole." (*Id., passim*).

In the case at bench, on Sunnyside's "Petition for Writ of Review or Writ of Mandate," we issued an "Alternative Writ of Mandate." Our alternative writ will be treated as a writ of review.

## II.

We next consider the Board's appearance "specially and solely for the purpose of objecting to this Court's jurisdiction . . . ."

The objections, as we read them, are (1) that Sunnyside's petition was not timely filed, (2) that service of the petition upon the Board was not made by hand upon " 'the clerk, secretary, president, presiding officer [of the Board], or other head of its governing body,' " or upon a person

---

confer with him during working hours without loss of time or pay.

"(c) By discrimination in regard to the hiring or tenure of employment, or any term or condition of employment, to encourage or discourage membership in any labor organization."

" 'apparently in charge,' " and (3) that the service by mail was made to an address from which the Board had moved.

It is noted that no prejudice appears to have resulted to the Board, or to the Union, from the claimed procedural shortcomings.

The Board's order was dated May 20, 1977, and was mailed to Sunnyside May 23, 1977. ■ The Act, Labor Code section 1160.8, provides that the "petition shall be filed with the court within 30 days from the date of the *issuance* of the board's order." (Italics added.) ■ The generally accepted meaning of the terms "issue" and "issuance" is to "send forth; to emit; to promulgate; . . . put into circulation; . . ." (See Black's Law Dict. (4th rev.ed. 1968) p. 964, col. 2; 22A Words and Phrases (1958) p. 530.) ■ The legislative choice of the word "issuance" reasonably indicates that something more than "signing" or "filing" of the Board's order was intended. We hold that "issuance" of the Board's order occurred when it was mailed to Sunnyside. So construing Labor Code section 1160.8, Sunnyside's petition was timely filed.

In respect of the Board's claim of deficient service we consider rule 56(a) of the California Rules of Court relating to a "petition to a reviewing court for a writ of mandate, certiorari, or prohibition, or for any other writ within its original jurisdiction, . . ." Rule 56(b) provides that the reviewing "court *in its discretion* (1) may allow the filing of the petition without service, and (2) may act on the petition without requiring the prior filing of opposition." (Italics added.) And Code of Civil Procedure section 1107, also relating to such writ applications, provides: "The court in which the application is filed, in its discretion and for good cause, may grant the application ex parte, without notice or service of the application as herein provided."

Applying these rules we conclude that this court has "jurisdiction" over the Board and to consider Sunnyside's petition on its merits.

For the same reason a motion of the Board to dismiss Sunnyside's petition will be denied.

### III.

We come now to the substantive issues of the case.

As noted, the hearing officer and thus the Board which adopted his findings, found Sunnyside to have committed the unfair labor practices denounced by Labor Code section 1153, subdivisions (a), (b) and (c). (See fn. 1, *ante.*)

Labor Code section 1160.8, and as noted, *Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd., supra,* provide that the "findings of the board with respect to questions of fact if supported by *substantial evidence on the record considered as a whole* shall . . . be conclusive." (Italics added.)

This language was taken verbatim from the National Labor Relations Act (29 U.S.C.A. § 160(f)). And, as pointed out, judicial precedents relating to the federal statute's section 160(f) will be followed in the interpretation and analysis of the Act's section 1160.8.

One such authority is *Universal Camera Corp.* v. *Labor Bd.,* 340 U.S. 474 [95 L.Ed. 456, 71 S.Ct. 456]. ■ Referring to the federal statute, the high court stated (p. 491 [95 L.Ed. at p. 469]): "Whether on the record as a whole there is substantial evidence to support agency findings is a question which Congress has placed in the keeping of the Courts of Appeals," and (p. 490 [95 L.Ed. at pp. 468-469]) that: "*[C]ourts must now assume more responsibility for the reasonableness and fairness of Labor Board decisions than some courts have shown in the past. Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function.* Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Courts of Appeals. The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." (Italics added.)

The federal "substantial evidence" test is strikingly similar to that fashioned by Justice Tobriner in *LeVesque* v. *Workmen's Comp. App. Bd.,* 1 Cal.3d 627, 636-637 [83 Cal.Rptr. 208, 463 P.2d 432], where, rejecting the " '*any* substantial evidence' " rules which had often been applied in

compensation cases, courts were required thereafter "to review the *entire record* to determine whether the board's conclusion was supported by substantial evidence." (Italics added.) See *Avondale Shipyards, Inc.* v. *N.L.R.B.*, 391 F.2d 203, 206, holding: " 'Substantial evidence' does not mean 'any evidence.' "

In our inquiry whether the Board's findings and order were supported by "substantial evidence on the record considered as a whole," we are given little aid by the Union's briefs. There, for the asserted "facts of the case" we are referred only to the Board's findings, which in turn furnish no record reference. The requirement of rule 15(a), California Rules of Court, that: "The statement of any matter in the record shall be supported by appropriate reference to the record" is wholly ignored. (And see 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 421, p. 4389.) The Board's brief makes some record references but large portions of it, purporting to be factual argument, are found to have been lifted verbatim from the Board's findings, again without record reference. Such lack of assistance has necessitated the close inquiry by this court into the entire voluminous record of the Board's hearing.

In our study of the record, and our comparison of it with the Board's findings, we observe *without exception* that *every* witness produced by the complaining Union was expressly found "credible," or to have given "credible testimony," or to have "credibly testified," or to have "testified in a most credible way." On the other hand, *also without exception, all* of Sunnyside's material witnesses, many of whom were coworkers of the Union's witnesses, were expressly found "unconvincing," or to lack "credibility," or to be "unworthy of credit." The findings state: "Furthermore, the testimonial demeanor of Mr. Yoshida, his brother Eiichi [Sunnyside's vice president and president, respectively], and some six supervisors who testified can be fairly described as demanding the conclusion that their testimony lacks credibility." On account of this absolute imbalance of "credibility" found by the hearing officer, *every one* of the numerous detailed factual issues[2] presented to the hearing officer was resolved against Sunnyside.

(a) We advert now to the first of the three violations of the Act charged against Sunnyside, i.e., that it did "interfere with, restrain, or coerce

---

[2]The Board, contrary to the Union's complaint, found *one* of Sunnyside's employees *not* to have been discriminatorily discharged. But there was *no* evidence offered to support the charge, and thus no issue.

agricultural employees in the exercise of the rights guaranteed in Section 1152."[3]

There was, to be sure, much "anti-union animus" on the part of Sunnyside during the Union's organizing efforts, as found by the Board. But such *animus* appears to have been fairly balanced by the "anti-employer animus" of the Union, a not uncommon feature of such economic disputes. The claimed interference with, and coercion of, Sunnyside's workers' rights arose from what the company insists was its First Amendment right to express its views, by argument and opinion, whether its agricultural workers should vote for Union representation.

Sunnyside relies upon such authority as Labor Code section 1155, and *N.L.R.B.* v. *Lenkurt Electric Company,* 438 F.2d 1102.

*N.L.R.B.* v. *Lenkurt Electric Company, supra,* page 1108, states: "The Supreme Court and this circuit are committed to the principle that debate in union campaigns should be vigorous and uninhibited, subject to the limitations we have heretofore set forth. . . . The exercise of free speech in these campaigns should not be unduly restricted by narrow construction. It is highly desirable that the employees involved in a union campaign should hear all sides of the question in order that they may exercise the informed and reasoned choice that is their right."

Labor Code section 1155 provides: "The expressing of any views, arguments, or opinions, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute evidence of an unfair labor practice under the provisions of this part, if such expression contains no threat of reprisal or force, or promise of benefit."

■ We are of the opinion that as to many of the Board's factual findings on the instant issue, the evidence preponderated to the contrary, or that at least it was subject to reasonable opposing inferences. And we further opine that much of Sunnyside's instantly complained of conduct was under First Amendment protection, and permissible according to

---

[3]Labor Code section 1152 provides: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of continued employment as authorized in subdivision (c) of Section 1153."

Labor Code section 1155 and *N.L.R.B.* v. *Lenkurt Electric Company, supra,* 438 F.2d 1102, 1108.

But we entertain no doubt of the existence of "substantial evidence on the record considered as a whole" that Sunnyside had made some "threat of reprisal," and "promise of benefit" (see Lab. Code, § 1155) in the event the Union lost the election, to at least some of its agricultural employees. Believing such witnesses as they did, the hearing officer and the Board reasonably found violations of Labor Code section 1153, subdivision (a).

(b) We next consider the claimed violation of Labor Code section 1153, subdivision (b), the text of which will be found in footnote 1, *ante.*

■ Labor Code section 1160.2 provides that whenever it is charged that an agricultural employer has engaged in unfair labor practices as defined by the Act, there shall be served "a complaint stating the charges in that respect," upon the employer who "shall have the right to file an answer . . . and to appear in person or otherwise and give testimony [thereon] . . . ."

No charge, or complaint, was ever made by the Union, or anyone, against Sunnyside in respect of Labor Code section 1153, subdivision (b). But at the Board's hearing evidence was adduced that Sunnyside had established a "grievance committee" of some of its agricultural employees, and had thus interfered with, or restrained, or coerced its employees in the exercise of their rights, as charged in the claimed section 1153, subdivision (a), violation. Upon the filing of the Board's findings and order, Sunnyside was advised for the first time of the purported section 1153, subdivision (b), violation.

Sunnyside contends: "The Board in adopting the Administrative Law Officer's finding that the Petitioner violated Section 1153(b) of the Act has abused its discretion by making such a conclusion without first affording the Petitioner any opportunity to present evidence and legal argument that no such violation occurred."

We agree. The Board's findings and order, insofar as they relate to section 1153, subdivision (b), were violative of Labor Code section 1160.2, and were contrary to elementary constitutional principles of procedural

due process. (See *Scott* v. *City of Indian Wells,* 6 Cal.3d 541, 549 [99 Cal.Rptr. 745, 492 P.2d 1137].) They will accordingly be set aside.

No record support whatever is found for the Board's recital that the section 1153, subdivision (b), issue was "raised and fully litigated at the hearing, . . ."

(c) The remaining unfair labor practice charged against Sunnyside was, as noted, a violation of Labor Code section 1153, subdivision (c), which is defined as: ". . . discrimination in regard to the hiring or tenure of employment, or any term or condition of employment, to encourage or discourage membership in any labor organization."

The Union and the Board contend that in "dismissing" two, and "laying off" seventeen, of its agricultural workers after the election, Sunnyside discriminatingly discouraged membership in the Union.

The leading authority on the instant issue is *American Ship Bldg.* v. *Labor Board,* 380 U.S. 300, 311 [13 L.Ed.2d 855, 863, 85 S.Ct. 955], where the high court stated: "Section 8(a)(3) [29 U.S.C.A. § 158(a)(3), the federal counterpart of Lab. Code, § 1153, subd. (c)] prohibits discrimination in regard to tenure or other conditions of employment to discourage union membership. Under the words of the statute there must be both discrimination and a resulting discouragement of union membership. It has long been established that a finding of violation under this section will normally turn on the employer's motivation. . . . Thus when the employer discharges a union leader who has broken shop rules, the problem posed is to determine whether the employer has acted purely in disinterested defense of shop discipline or has sought to damage employee organization. It is likely that the discharge will naturally tend to discourage union membership in both cases, because of the loss of union leadership and the employees' suspicion of the employer's true intention. But we have consistently construed the section to leave unscathed a wide range of employer actions taken to serve legitimate business interests in some significant fashion, even though the act committed may tend to discourage union membership. . . . Such a construction of § 8(a)(3) is essential if due protection is to be accorded the employer's right to manage his enterprise."

Other guiding authority is found in *N.L.R.B.* v. *Ace Comb Company,* 342 F.2d 841, 847: "It has long been established that for the purpose of

determining whether or not a discharge is discriminatory in an action such as this, it is necessary that the true, underlying reason for the discharge be established. That is, the fact that a lawful cause for discharge is available is no defense where the employee is *actually* discharged because of his Union activities. *A fortiori,* if the discharge is *actually* motivated by a lawful reason, the fact that the employee is engaged in Union activities at the time will not tie the employer's hands and prevent him from the exercise of his business judgment to discharge an employee for cause. [Citations.] It must be remembered that it is not the purpose of the Act to give the Board any control whatsoever over an employer's policies, including his policies concerning tenure of employment, and that an employer may hire and fire at will for any reason whatsoever, or for no reason, so long as the motivation is not violative of the Act."

■ A subject of the complained of discrimination was one Maria Coyt who, known to Sunnyside, had been actively promoting the preelection efforts of the Union. She had worked for Sunnyside for about five weeks. The company's recorded reasons for her discharge were "insubordination" and "noncooperative—won't follow instructions." She was not laid off for "lack of work," and accordingly was not subject to rehiring.

Ms. Coyt's job supervisor's testimony established that she was "fired" because "she wasn't doing the job properly and every time I tried to tell her how to do it, she'd come back with: 'You don't have any right to tell me how to do the job.' " He had told her many times how to properly do her work and her "response was that I didn't tell her how to do it and I was always changing my mind." There was no improvement in her work. He finally recommended her termination, telling his superior: "I can't work with this girl, I tried to tell her how to do a job and all's [*sic*] I get is a lot of mouth back but no response as far as doing the work." The supervisor's statement was substantially corroborated by Ms. Coyt, who conceded that her supervisor was dissatisfied with her work, and had told her she was "not working fast enough," and "to try to hurry up a little faster." She agreed that her response was "that wherever I had ever worked, that no one had ever required that of me," and that her work "wasn't by piece work. It was an hourly basis."

It is notable that at the time of Ms. Coyt's discharge, all of the Union's many supporters, for whom there was available work and with whose work no fault was found, were retained in their employment.

Ms. Coyt's admitted reaction to her supervisor's complaints must reasonably be considered insubordination, and cause for her discharge.

A somewhat similar factual context appears in *N.L.R.B.* v. *Ace Comb Company, supra,* 342 F.2d 841, 847, where the court said: "Here, it clearly appears when Woodliff disagreed with his foreman, Wagner, he simply refused to obey and, as found by the Examiner, gave the employer cause to discipline him. The Examiner concluded, however, that the real motivation for the discharge was anti-Union bias. Such conclusion of the Examiner can only be convincing if the evidence of cause for Woodliff's discharge is wholly discredited." In the case at bench the evidence of cause for Ms. Coyt's discharge was not wholly discredited; indeed it was confirmed by the employee herself, and by the fact that there were many similar Union sympathizers whose employment continued indefinitely.

The burden of proof rested upon the Union and the Board to establish that Ms. Coyt's employment was improperly terminated. (*Stone & Webster Engineering Corp.* v. *N.L.R.B.,* 536 F.2d 461, 464; *N.L.R.B.* v. *Fibers International Corporation,* 439 F.2d 1311, 1312; *N.L.R.B.* v. *Winn-Dixie Stores, Inc.,* 410 F.2d 1119, 1121.) We opine that this burden was not met, and that the Board's instant findings were not supported by "substantial evidence on the record considered as a whole."

The other discharged employee of the Union's complaint was one Luis Castenada. He had worked for Sunnyside for about six months, and had been a Union adherent. His foreman testified that Mr. Castenada was discharged because "He was slow and then I caught up with my work." About a week before Castenada had been warned that "he was too slow," and his work had not improved. At the time: "[T]he job he was doing, it should have been finished, done. I asked him how come he hasn't finished, you know, with that, what he was doing. And sometimes he just wait and see if nobody was watching him, . . ." Sunnyside's records indicated Mr. Castenada was laid off because he was "too slow." Mr. Castenada himself testified: "He told me that there was very little work and he was releasing people and that it was my turn, I was next. And that is all."

The Board's finding that the foreman "said he was following orders from Sho Yoshida [Sunnyside's vice president]" is based entirely on Mr. Castenada's following cryptic testimony: "Q. When Roberto laid you off, did he say if he was following orders from someone else? A. Yes. Q.

Whose orders? A. From the *foreman,* Sho." (Italics added.) However, the foreman testified that he had suggested to Sho that Mr. Castenada "be laid off," it was his, the foreman's, "idea"; he told Sho when he "wanted to lay off some people" to make the "business more efficient." Sho approved the recommendation in respect of Mr. Castenada.

In the case of Mr. Castenada also, upon his discharge the great preponderance of Sunnyside's employees who had actively supported the Union were continued on their jobs.

Here again, our perusal of the whole record reasonably compels the conclusion that Mr. Castenada's discharge was motivated by a lawful reason; as said in *N. L. R. B.* v. *Ace Comb Company, supra,* 342 F.2d 841, 847: "[T]he fact that the employee is engaged in Union activities at the time will not tie the employer's hands and prevent him from the exercise of his business judgment to discharge an employee for cause."

The remaining claimed violation of Labor Code section 1153, subdivision (c), consisted of Sunnyside's "layoff," as distinguished from "discharge," of 17 (or 20) employees sometime *after* the election.

On this issue, uncontroverted evidence established the following factual context. In the spring of 1975, Sunnyside had initiated the propagation and cultivation of 64,000 "hanging baskets" containing ferns or other plants for sale to supermarket chains. At the close of the Easter lily peak employment season, a number of Sunnyside's employees who would customarily have been laid off were continued on their jobs in caring for the hanging baskets. By October these plants had been mostly sold and delivered, and Sunnyside found itself with unneeded employees. Because of its current problem with the Union, the company sought counsel of its attorney who advised that wherever possible the layoffs should be in accordance with seniority. Sunnyside thereafter laid off the 17 (or 20) employees who are the subject of the instant contention. At the time of the hearing no others had been needed or hired in their place; nor had there been "overtime" work for the retained employees.

Sunnyside contended that the layoffs were motivated by economic reasons without regard to the previous Union activity of those affected. The Union contended, and the Board found, that the "layoffs were discriminatorily motivated and in violation of the Act."

We consider the findings of the Board, claimed to be supportive of its decision.

The Board found that every dismissed employee who testified (17 of them; 3 others did not) was a Union supporter. This was based upon the answer of each long after the election and *at the hearing,* "Yes," to the Union's question, "Are you a Chavista?"[4] But prior to the layoffs the only Union support shown by at least half of them was indicated by the acceptance of a Union "leaflet," or by attending an advertised Union meeting, or by "talking" with others about the Union. Rather than indicating Union support, such activities showed no more than a willingness to hear both sides of, or an interest in, the then current dispute. Indeed, the inability to develop evidence of more "support" of the Union from the Union's own witnesses reasonably suggests that such evidence was unavailable. The evidence thus indicates that among the laid-off employees, the Union's active supporters were in approximately the same proportion as those who had voted for the Union at the election.

The Board's findings make no determination that the layoffs were not substantially based evenhandedly upon the affected employees' lack of seniority.[5] And they appear to recognize that lack of seniority was a proper criterion, for they speak of Sunnyside's employees' "substantial seniority" and their "seniority and other rights and privileges."

In our opinion, layoffs according to seniority, as suggested to Sunnyside by its counsel, appear to be the fairest manner of implementing them. And none of the parties has disagreed or proposed a more desirable method.

Sunnyside's agricultural workers were preponderantly of "Spanish appearing surnames." Another, and much smaller, ethnic grouping

---

[4] At this point the Union's 17 witnesses had a financial interest in the outcome of the proceedings; they were seeking the several months of back wages later awarded them by the Board's order. (See Witkin, Cal. Evidence (2d ed. 1966) Introduction of Evidence at Trial, § 1113, p. 1029.)

[5] Three exceptions are observed to Sunnyside's practice of laying off its employees according to lack of seniority. One was a trainee for a management position who held a degree in the field of horticulture; he was working as a crew member, but at a higher salary, to obtain firsthand knowledge of Sunnyside's operations. Another, a student engaged in a work-study program for the University of Colorado, returned to school a month or two later. The third was a crew leader who spoke English and Spanish and whose retention was essential to her crew's functioning.

consisted of "Koreans." Although no express contention or finding was made of discrimination between the two, the findings recite that: "[T]estimony established that [Sunnyside] generally recognized that such ethnic groupings as its Korean employees did not support the UFW (and no such employees were dismissed) and that a large body of UFW support came from the relatively young Mexican-American or Spanish-speaking employees (and every dismissed employee had a Spanish surname)."[6] If meaning is to be given this recital, it would necessarily be that Sunnyside should have discriminated against its Korean employees *whose seniority was the greater*—an argument which is patently unacceptable.

Nor, although concluding that the layoffs had been "discriminatory," do the findings purport to find that they were economically unjustified. Instead they say that "even where a valid reason for discharge may exist, a discharge nonetheless violates the Act where the moving reason for it relates to Union activity," and "that even if some or all of the layoffs were justified, the method employed by [Sunnyside] in selecting those for layoff was discriminatory and unlawful."

In our opinion, the record establishes the probability, suggested by the Board, that a valid economic reason existed for the here questioned layoffs. And on the uncontroverted evidence before the Board, no basis in law or reason appears for the "finding" that although Sunnyside's employees may have been laid off for valid economic reasons "the method [i.e., lack of seniority] employed . . . in selecting those for layoff was discriminatory and unlawful." Such a rationale is squarely contrary to federal authority "that an employer may hire and fire at will for any reason whatsoever, or for no reason, so long as the motivation is not violative of the Act." (*N.L.R.B.* v. *Ace Comb Company, supra,* 342 F.2d 841, 847, and see authority there collected.)

We conclude from the record "considered as a whole" that substantial evidence supports a finding *only* that the layoffs were nondiscriminatory and lawful.

## IV.

There is a remaining issue.

---

[6]This latter parenthesized finding is contrary to the record.

The Board on the recommendation of its hearing officer ordered certain sanctions against Sunnyside, the severity of which appears to be without equal, even in the 40-year history of the National Labor Relations Act the precedents of which, as noted, the Board is required by statute and judicial authority to follow.

Among the more oppressive of the sanctions is an express requirement that Sunnyside allow the Union's organizers, *in unlimited numbers,* to enter upon its property for a period of 30 days. The severity of the order was compounded by an accompanying direction that this incursion be permitted *immediately* upon written notice and whether or not there was legitimate reason therefor, i.e., "without regard to the pendency or result of [any Union] representation proceeding."

We are advised of no precedent, and find no justification in reason, for such a sanction which seems calculated only to intimidate, or punish, Sunnyside and to invite breaches of the peace and encourage further industrial strife. Moreover, there was neither complaint, nor evidence, nor finding by the Board, that Sunnyside had in any way interfered, or attempted to interfere, with the Union's organizers upon its property in the events leading to the election. The sanction is patently unreasonable, and a gross abuse of discretion.

The Board undoubtedly has wide discretion in ordering affirmative action to remedy unfair labor practices. But that discretion is not unbounded. It must be exercised reasonably by the Board whose "power to command affirmative action is remedial, *not punitive,* . . ." (*Edison Co.* v. *Labor Board,* 305 U.S. 197, 236 [83 L.Ed. 126, 143, 59 S.Ct. 206]; italics added.) "In fashioning remedies to undo the effects of violations of the Act, the Board must draw on enlightenment gained from experience." (*Labor Board* v. *Seven-Up Co.,* 344 U.S. 344, 346 [97 L.Ed. 377, 381, 73 S.Ct. 287].) Here the Board in its short life had acquired little expertise; it would have done well to have drawn on the long experience of its federal counterpart, the National Labor Relations Board, and the related judicial determinations under the National Labor Relations Act.

The order of the Agricultural Labor Relations Board is annulled insofar as it relates to the charged violations of Labor Code section 1153, subdivisions (b) and (c); it is affirmed insofar as it relates to Labor Code section 1153, subdivision (a). The sanctions of the order are set aside. The Board's motion to quash service of, and its motion to dismiss, Sunnyside's

petition to this court for relief are denied. The cause is remanded to the Board for such further proceedings, and sanctions, if any, as are in accordance with law and not inconsistent with the views we have expressed. The parties will stand their respective costs of this review.

Draper, J.,* and Low, J.,† concurred.

A petition for a rehearing was denied July 10, 1979, and petitioner's application for a hearing by the Supreme Court was denied August 22, 1979. Bird, C. J., did not participate therein.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

†Assigned by the Chairperson of the Judicial Council.