[No. H009259. Sixth Dist. June 30, 1993.]

UNITED FARM WORKERS OF AMERICA, AFL-CIO, Petitioner, v. AGRICULTURAL LABOR RELATIONS BOARD, Respondent; PAUL W. BERTUCCIO, Real Party in Interest.

1632

COUNSEL

Marcos Camacho and Dianna Lyons for Petitioner.

J. Antonio Barbosa and Joseph A. Wender, Jr., for Respondent.

Rynn & Janowsky and Lewis P. Janowsky for Real Party in Interest.

OPINION

**BAMATTRE-MANOUKIAN, J.**—In one of several matters involving San Benito County grower Paul W. Bertuccio, the Agricultural Labor Relations Board (the Board) found Bertuccio guilty of refusal to bargain in violation of the Agricultural Labor Relations Act (the ALRA) and ordered (among other things) that he make whole his employees for economic losses caused by the refusal. (*Paul W. Bertuccio* (Dec. 29, 1982) 8 ALRB No. 101 as modified in *Paul W. Bertuccio* (Oct. 24, 1983) 9 ALRB No. 61.)

We affirmed the decision and order in most respects but remanded the matter to the Board with directions to set aside its first make-whole order, to reconsider the make-whole issues in light of *William Dal Porto & Sons, Inc.* v. *Agricultural Labor Relations Bd.* (1987) 191 Cal.App.3d 1195 [237 Cal.Rptr. 206] (*Dal Porto II*), and, if it determined that make-whole should be ordered, to make such new make-whole order as it found to be

appropriate. (*Bertuccio* v. *Agricultural Labor Relations Bd.* (1988) 202 Cal.App.3d 1369, 1404-1405 [249 Cal.Rptr. 473] [*Bertuccio I*].)

On remand the Board considered new evidence in light of *Dal Porto II* and concluded, in its decision in *Paul W. Bertuccio* (Nov. 27, 1991) 17 ALRB No. 16, that make-whole was not appropriate for the make-whole period beginning in January 1979 and ending April 1, 1981. The matter now returns to us, upon the petition of the employees' collective bargaining representative, United Farm Workers, AFL-CIO (the UFW), for review of the Board's decision on remand. We shall reject the UFW's assertions of legal error; finding that the record supports the Board's conclusion, we shall affirm the decision.

The ALRA expressly provides for "making employees whole, when the board deems such relief appropriate, for the loss of pay resulting from the employer's refusal to bargain . . . ." (Lab. Code, § 1160.3.) Bertuccio's unlawful refusal to bargain has been conclusively established in prior proceedings. The Board's conclusion that make-whole was not appropriate in this case was based on its finding that (in ultimate effect) the refusal to bargain had not caused cognizable loss of pay to Bertuccio's employees. The narrow issue before us is the propriety of this finding.

█ As we explained in *Bertuccio I*, the make-whole concept necessarily assumes the employees would have been paid but for the grower's refusal to bargain. *Dal Porto II* held that make-whole relief may be imposed only where the Board has made a finding that the parties would have entered into a collective bargaining agreement for higher pay *but for* the grower's refusal to bargain. The Board's general counsel has the initial burden of producing evidence to show the grower unlawfully refused to bargain. "[O]nce the Board produces evidence showing the employer unlawfully refused to bargain, the burden of persuasion shifts to the employer to prove no agreement calling for higher pay would have been concluded in the absence of the illegality. . . . If the employer fails to carry its burden in this regard, the Board is entitled to find an agreement providing for higher pay would have been concluded in the absence of the employer's refusal to bargain." (*Dal Porto II, supra,* 191 Cal.App.3d at pp. 1208-1209.)

*Dal Porto II* was decided after the Board issued its decisions and orders in the Bertuccio matters and while those matters were awaiting review in this court. Recognizing that the *Dal Porto II* rules were at sharp variance with prior Board practice, and consistent with procedures followed in *Dal Porto II*, we directed that on remand the Board should permit Bertuccio to present

legal argument and (if so advised) to ask leave, on the basis of a written offer of proof, to present additional evidence. We left to the Board's discretion determinations whether any proffered evidence (1) was relevant and (2) was not simply cumulative of evidence already in the record. If the Board concluded the evidence met both standards, it was to receive and consider the evidence and any similarly qualified evidence responsive to it.

On remand Bertuccio took the position that the Board should not reinstate its makewhole order because there was in fact an independent, and legitimate, cause for the parties' failure to agree: Throughout the relevant period (according to Bertuccio) the UFW had insisted on wage rates at or above the level to which a Salinas-based grower named Sun Harvest had agreed in earlier collective-bargaining negotiations, while Bertuccio had offered substantially lower wage rates upon the assertedly reasonable basis that San Benito County, where Bertuccio farmed, was wholly distinct from the Salinas area where Sun Harvest had entered into its collective bargaining agreement, that there was no relevant competition between the areas, that San Benito County-based growers in direct competition with Bertuccio paid substantially less than Sun Harvest wage rates, and that for these and other reasons it would not be "economically feasible" for Bertuccio to pay the demanded Sun Harvest rates. Obviously accord as to rates of pay was essential to a collective bargaining agreement. Given the UFW's firm commitment to Sun Harvest rates (Bertuccio argued), so long as Bertuccio believed and maintained in good faith that it would be economically unfeasible to meet the UFW's wage demands there could be no collective bargaining agreement between the parties regardless of Bertuccio's assertedly unlawful refusal to bargain on other issues.

The Board granted Bertuccio an evidentiary hearing, at which Bertuccio produced substantial evidence to support his assertions on remand. Following the hearing an administrative law judge agreed with the UFW that Bertuccio had not borne his *Dal Porto II* burden of proof and that the make-whole order should be reinstated. The Board, as the ultimate finder of fact (cf. *Royal Packing Co.* v. *Agricultural Labor Relations Bd.* (1980) 101 Cal.App.3d 826, 835 [161 Cal.Rptr. 870]), disagreed with the administrative law judge, agreed with Bertuccio that make-whole was not appropriate, and therefore declined to reinstate the make-whole order.

In support of its petition for judicial review, the UFW argues that the Board had misconstrued *Dal Porto II* in:

(1) Failing to require Bertuccio to show that the parties had already bargained to impasse; and

(2) Disregarding previously affirmed findings of Bertuccio's bad faith.

### 1. *Dal Porto II*

To analyze the parties' positions and the Board's decision we revisit *Dal Porto II*.

*Dal Porto II* took cognizance of the ALRA's requirement that the loss of pay for which employees could be made whole must have resulted from the employer's refusal to bargain. The Court of Appeal properly allocated to the Board's general counsel the burden of showing preliminarily that the employer had in fact refused to bargain, and explicitly acknowledged that "[t]he only logical place to locate the greater pay" the employees had lost and for which they could therefore be made whole "is in a collective bargaining agreement that would have been consummated but for the employer's refusal to bargain. . . . [¶] . . . [¶] . . . [S]ection 1160.3 necessarily contemplates make-whole relief may be imposed only where the parties would have entered into a collective bargaining agreement providing for higher pay in the absence of the employer's refusal to bargain." (*Dal Porto II, supra,* 191 Cal.App.3d at p. 1205.)

Then *Dal Porto II* turned to the much more difficult questions of how a causal connection between the employer's refusal to bargain and the failure to consummate a collective bargaining agreement could be proved or disproved, and who should be required to prove or to disprove the causal connection.

The concept of cause in fact has been much mooted, characteristically in the tort context. (Cf., e.g., *Mitchell* v. *Gonzales* (1991) 54 Cal.3d 1041, 1049-1053 [1 Cal.Rptr.2d 913, 819 P.2d 872]; *Brookhouser* v. *State of California* (1992) 10 Cal.App.4th 1665, 1677 [13 Cal.Rptr.2d 658].) But the cause problems *Dal Porto II* set about to solve differ from, and arguably are more complex than, the cause issues in (for example) the majority of tort or breach of contract cases, in at least two respects.

First, in tort or breach of contract cases cause ordinarily will be analyzed in the context of a disruption of the status quo: A healthy person has been injured or even killed, an employed person has been fired, an existing contract has been breached. In each instance the disruption of the status quo assertedly has injured the plaintiff, and a pivotal issue will be whether unprivileged conduct of the defendant *caused* the disruption and thus the injury. In the make-whole context, characteristically, the status quo is a labor-management relationship with which the employees or the union is

dissatisfied, the employees or the union hopes for a *change* in the status quo in the form of a collective bargaining agreement at higher pay rates, and the question is whether the employer's refusal to bargain has *prevented* the hoped-for change in the status quo. In the ordinary tort or contract action both the status quo and its disruption will lend themselves to empirical demonstration, but in the make-whole context only the status quo will be an established fact: Proof that particular conduct has *prevented* an *anticipated* (and thus necessarily hypothetical) *change* in the status quo will invariably require that the likelihood of the change, absent the employer's conduct, somehow be established. This requirement is broadly analogous to the required threshold determination, in an action on the relatively exotic tort theory of interference with prospective economic advantage, that "it is reasonably *probable* that the lost economic advantage would have been realized but for the defendant's interference." (*Youst* v. *Longo* (1987) 43 Cal.3d 64, 71 [233 Cal.Rptr. 294, 729 P.2d 728, 85 A.L.R. 1025]; cf. generally 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 664, pp. 759-760.)

The second point of distinction exacerbates the problems implicit in the first: Even absent wrongful conduct on either side, the anticipated event—consummation of a collective bargaining agreement—would depend upon a good faith meeting of the minds between parties whose conflicting economic interests would often generate a highly adversarial negotiating climate and who in many cases would not be at the bargaining table at all but for the compulsion of applicable labor statutes. In short the notion that the employer and the union, even in the best of faith, would ultimately agree is inherently problematic. This difficulty is recognized both in the ALRA's provision that the duty to bargain in good faith "does not compel either party to agree to a proposal or require the making of a concession" (Lab. Code, § 1155.2, subd. (a)) and in the concept of bargaining *impasse* endorsed both in federal labor law (cf. generally 1 Hardin, The Developing Labor Law (3d ed. 1992) pp. 691-699) and under the ALRA (cf. *Ruline Nursery Co.* v. *Agricultural Labor Relations Bd.* (1985) 169 Cal.App.3d 247, 263 [216 Cal.Rptr. 162]; *Dal Porto II, supra,* 191 Cal.App.3d 1195, 1212).

*Dal Porto II* itself acknowledged that in light of these problems "[t]he effect of unlawful conduct on the progress of negotiations is . . . ordinarily one of uncertainty." (191 Cal.App.3d at p. 1208.) Because " '[t]he most elementary conceptions of justice and public policy require that the wrong-doer shall bear the risk of the uncertainty which his own wrong has created' " (*ibid.*), *Dal Porto II* allocated the burden of persuading the Board that its refusal to bargain had *not* prevented consummation of a collective

bargaining agreement to the employer, and empowered the Board, if not persuaded by the employer, to find (without requiring the employees or their union to furnish proof) that a collective bargaining agreement for higher pay *would* have been concluded had the employer not refused to bargain. Thus in a sense *Dal Porto II* preserved the preexisting presumption that there would have been a collective bargaining agreement had the employer not refused to bargain, but made the presumption rebuttable. (Cf. *Dal Porto II, supra,* 191 Cal.App.3d at pp. 1210-1211.)

This left for determination (1) the tests the employer would be required to meet in order to persuade the Board (and thus to rebut the presumption), and (2) the kind of evidence the employer could use to try to meet those tests.

Given threshold proof that the employer had unlawfully refused to bargain, the employer obviously would need initially to show that some other, legitimate cause had operated to prevent agreement. Thus, implicit in the *Dal Porto II* procedures was the likelihood that in many if not most cases the Board would be required to deal with the problem of *multiple causes.*

To provide guidelines to a solution *Dal Porto II* turned to *Martori Brothers Distributors* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 721 [175 Cal.Rptr. 626, 631 P.2d 60]. *Martori Brothers Distributors* dealt not with make-whole but with alleged discriminatory discharge for ALRA-protected activities in violation of subdivisions (a), (c) and (d) of Labor Code section 1153. The Board had found that the grower had committed an unfair labor practice by firing a worker who had engaged in activities on behalf of the UFW and had filed a previous unfair practice complaint against the grower. The grower had taken the position that (in essence) the worker had been fired not for his union activities and previous complaint but because he was an erratic troublemaker. In the course of judicial review the Supreme Court acknowledged that "[t]he mere fact an employee is or was participating in union activities does not insulate him from discharge for misconduct or give him immunity from routine employment decisions" (*Martori Brothers Distributors* v. *Agricultural Labor Relations Bd., supra,* 29 Cal.3d 721, 728-729), and considered the various approaches previously taken to multiple causes in this context:

"Where the evidence indicates that an employer was motivated by both an antiunion bias and legitimate business interests in discharging an employee, the so-called 'dual motive' situation, the courts have applied at least three different rules. Some cases have held that if antiunion bias played any part in, or partially motivated, the discharge, the employee is entitled to

reinstatement even though other legitimate grounds for discharge may exist. [Citations.]

"Other authorities have applied a second or 'dominant motive' test for the discharge, focusing on a determination of whether union activities or legitimate business reasons were the principal moving forces behind the discharge. [Citation.]

"Finally, a third line of cases has applied a 'but for' test. When it appears that an employee was dismissed because of combined valid business reasons as well as for invalid reasons, such as union or other protected activities the question becomes whether the discharge would not have occurred 'but for' the protected activity. [Citations.]

"The 'but for' test is substantially the same test as that which is applied when it appears that a public employee was dismissed on the basis both of dissatisfaction with his conduct and his exercise of constitutional rights. [Citations.] . . . 'Just as we decline to permit school authorities to mask an unconstitutional dismissal behind a statement of valid causes, so we cannot allow a teacher genuinely dismissed for valid causes to be reinstated because school authorities were also displeased with his exercise of constitutional rights. If it were otherwise a teacher about to be dismissed for valid causes could insulate himself from dismissal simply by engaging in political activities offensive to his superiors.' . . .

"We think it significant that very recently the National Labor Relations Board adopted this 'but for' test. (*Wright Line, a Division of Wright Line, Inc.* (Aug. 27, 1980) 105 L.R.R.M. 1169, 1171-1173 [251 N.L.R.B. No. 150].) Under *Wright Line*, once the employee has shown that his union activities were a motivating factor in the employer's decision to discharge him, the burden shifts to the employer to show that discharge would have occurred in any event. If the employer fails to carry his burden in this regard, the board is entitled to find that discharge was improper. . . .

"Labor Code section 1148 provides that '[t]he board shall follow applicable precedents of the National Labor Relations Act, as amended.' In light of the recent *Wright Line* decision, the ALRB henceforth should apply this 'but for' standard in assessing the dual motive for discharge of agricultural workers under the Agricultural Labor Relations Act. When it is shown that the employee is guilty of misconduct warranting discharge, the discharge should not be deemed an unfair labor practice unless the board determines that the employee would have been retained 'but for' his union membership or his performance of other protected activities." (*Martori Brothers Distributors* v. *Agricultural Labor Relations Bd.*, *supra*, 29 Cal.3d 721, 729-730.)

In many ways discriminatory discharge cases such as *Martori Brothers Distributors, supra*, 29 Cal.3d 721, and *Wright Line, a Division of Wright Line, Inc.* (1980) 251 NLRB 1083, are much more analogous to tort actions for wrongful discharge—a wrongful disruption of the status quo—than to the make-whole question whether the employer has wrongfully prevented an anticipated change in the status quo. Nevertheless *Dal Porto II* concluded that *Martori Brothers Distributors*' test for mixed motives should be applied to multiple causes in the make-whole context, and that, as adapted to the uncertainties of the make-whole situation, "[t]he test is whether, but for the employer's unlawful refusal to bargain, the parties would have concluded a collective bargaining agreement." (*Dal Porto II, supra*, 191 Cal.App.3d at p. 1207.)

*Dal Porto II*'s adherence to *Martori Brothers Distributors*' selection of a but-for test from among three alternatives necessarily implies rejection of the alternatives. A showing that the employer's refusal to bargain "played any part in," or even that it was "the principal moving force[] behind," the parties' failure to agree would be wholly irrelevant to the question, under the but-for test, whether the parties would have agreed had the employer *not* refused to bargain. (*Martori Brothers Distributors* v. *Agricultural Labor Relations Bd., supra*, 29 Cal.3d at pp. 729-730.) In this case (for example) it would be difficult to avoid a conclusion that Bertuccio's refusal to bargain played at least some part in the parties' failure to consummate a collective bargaining agreement during the make-whole period. But once Bertuccio made a showing that there was a second, legitimate reason why the parties had not agreed, under the but-for test the possibility that Bertuccio's refusal to bargain standing alone would have caused the failure to agree became irrelevant: For purposes of make-whole analysis, the Board was required to *disregard* Bertuccio's refusal to bargain and then to determine whether Bertuccio had persuaded it that the parties nevertheless would not have reached agreement.

█ In sum, under *Dal Porto II* an employer who has been guilty of unlawful refusal to bargain, and who (to avert a make-whole order) has produced evidence of some alternative, legitimate cause for the parties' failure to agree, need not prove that the refusal to bargain was not *a* cause (whether minor or major) of the failure to agree: So long as the employer can show that the parties would not have agreed even if the employer had *not* refused to bargain, the employer can satisfy the but-for test.

As to the nature of the evidence an employer could use to bear the burden of proof, *Dal Porto II* stressed the need for *relevant* evidence and made clear

"speculative evidence is not relevant and is properly excluded." (*Dal Porto II, supra*, 191 Cal.App.3d at pp. 1211-1212.)

### 2. *Application of Dal Porto II Standards*

The Board concluded that *Dal Porto II* clearly "embraced the but-for analysis adopted in *Martori Brothers* [*Distributors*] and several times properly described that test," that *Dal Porto II* requires not that there have been "*actual* impasse" but rather that "legitimate differences *would have eventually led to impasse*," and that in sum "Bertuccio must demonstrate that his bad faith bargaining was not a but-for cause of the parties' failure to agree . . . ."

In essence the UFW contends that the Board misconstrued *Dal Porto II*.

### a. *Impasse*

The UFW argues that *Dal Porto II requires*, as the requisite non-speculative evidence that "no agreement calling for higher pay would have been concluded in the absence of the illegality" (*Dal Porto II, supra*, 191 Cal.App.3d at p. 1208), that the employer prove as a matter of "historical facts" that the parties had *already* bargained to *impasse*. (*Id.* at pp. 1211.)

The UFW bases this argument on *Dal Porto II*'s response to grower Dal Porto's assertion that its claim there would have been no agreement in any event was "shown by historical facts, i.e., the parties had bargained wholly in good faith to impasse":

" 'The Board has defined good faith bargaining as such bargaining as leads to either contract or a bona fide impasse.' [Citation.] ' "A genuine impasse is synonymous with a deadlock; the parties have discussed a subject or subjects in good faith, and despite their best efforts to achieve agreement with respect to such, neither party is willing to move from its respective position." ' [Citations.] 'Whether an impasse exists depends on whether, in view of all the circumstances of the bargaining, further discussions would be futile. [Citations.]' [Citation.] [¶] We see no reason why Dal Porto should not be able to show that no contract would have been consummated because the parties had bargained to impasse. However, we note Dal Porto must show its refusal to bargain had no effect on the failure to reach agreement. '[I]t is manifest that there can be no legally cognizable impasse, i.e., a deadlock in negotiations . . . if a cause of the deadlock is the failure of one of the parties to bargain in good faith. [Citations.]' [Citations.]" (*Dal Porto II, supra*, 191 Cal.App.3d at p. 1212.)

*Dal Porto II*'s nutshell summary of the rules of impasse, based on federal decisions, is broadly accurate. (Cf. generally 1 Hardin, The Developing Labor Law, *supra*, pp. 691-699.) ▮▮ Patently there had been no impasse here, at least in part because Bertuccio had not bargained in good faith. The extension of the UFW's argument is that because Bertuccio could not prove impasse he could not bear his *Dal Porto II* burden of proof.

The UFW's argument is unpersuasive for at least two reasons:

First, it is apparent that *Dal Porto II* regarded proof of existing impasse only as one of various ways in which an employer might undertake the *Dal Porto II* burden: The proposal to use the "historical facts" of impasse came not from the Court of Appeal but from Dal Porto, and the Court of Appeal simply acquiesced in Dal Porto's suggestion that it might be able to proceed in that way.

Second, existing impasse would rarely be available as a mode of proof in these cases: The premise on which make-whole is sought—that the employer has unlawfully refused to bargain—is essentially inconsistent with the requirement that a legitimate impasse be untainted by bad faith. It is conceivable that an employer might be able to show the parties had once (presumably before the refusal to bargain occurred) bargained to impasse, as a basis for a further assertion that the elements of the impasse persisted through the make-whole period. But it is inconceivable that *Dal Porto II* would have directed that the employer's proof be limited to so remote and unlikely a form of proof, and on its face *Dal Porto II* did not do so.

The UFW's response would be that our conclusion would permit an employer to meet the but-for rule by proving "that impasse *would have* occurred, a clearly speculative standard."

We respectfully suggest that the response would confuse the fact to be proved with the nature of the evidence admissible to prove it.

To meet its *Dal Porto II* burden the employer must prove "no agreement calling for higher pay *would have been* concluded" absent the employer's refusal to bargain. (*Dal Porto II, supra*, 191 Cal.App.3d at p. 1208, italics added.) The make-whole inquiry assumes no collective bargaining agreement was reached during the make-whole period; a determination whether, had the circumstances been different, such an agreement *would or would not have been* reached necessarily involves a process of inference from known facts to hypothetical, and perhaps in this sense "speculative," conclusions. But this hypothetical (or "speculative") reasoning process is exactly what

*Dal Porto II* contemplates. It is the *evidence*—the factual material from which the process of inferential reasoning must *begin*—that, to be relevant, must not be speculative.

Thus it would be permissible (for example) to prove empirically demonstrable prior impasse (*Dal Porto II, supra,* 191 Cal.App.3d at p. 1212), or at least empirically demonstrable prior legitimate disagreements between the parties on crucial issues (*id.* at p. 1206; *George Arakelian Farms, Inc.* v. *Agricultural Labor Relations Bd.* (1989) 49 Cal.3d 1279, 1292 [265 Cal.Rptr. 162, 783 P.2d 749]), or (to show that the parties' legitimate disagreements had been irreconcilable) that other similarly situated growers and union bargaining representatives had as a matter of empirically demonstrable fact gone to impasse over the same issues (*Mario Saikhon, Inc.* (May 30, 1989) 15 ALRB No. 3), to support an inference that, necessarily hypothetically, the parties would not in any event have reached agreement within the make-whole period: That, in essence, they would have been at impasse throughout the period. These examples should not be understood to limit the kinds of relevant evidence admissible to support the employer's hypothesis that a collective bargaining agreement would not have been entered into.

But Bertuccio was not required to prove that impasse had already been reached in order to bear his *Dal Porto II* burden.

### b. *Bertuccio's Bad Faith*

The UFW also argues that *Dal Porto II* required Bertuccio to prove his refusal to bargain " 'had *no effect* on the failure to conclude a collective bargaining agreement.' " The UFW asserts that findings (affirmed in published and unpublished portions of our opinion in *Bertuccio I*) that Bertuccio had unilaterally raised wages, refused to bargain over a substantial part of the bargaining unit, failed to provide an adequately informed negotiator, and failed to provide requested economic information demonstrated that Bertuccio could not show his own bad faith had had *no effect* on the parties' failure to reach agreement.

The UFW takes the quoted language (with its own emphasis added) from *Dal Porto II*'s statement that "the employer must bear the consequence of its illegality by proving it had no effect on the failure to conclude a collective bargaining agreement. Thus, once the Board produces evidence showing the employer unlawfully refused to bargain, the burden of persuasion shifts to the employer to prove no agreement calling for higher pay would have been concluded in the absence of the illegality." (*Dal Porto II, supra,* 191 Cal.App.3d at p. 1208, citing *Martori Brothers Distributors.*)

The UFW's position would have required Bertuccio in effect to meet the first of the three alternative tests considered in *Martori Brothers Distributors*, by showing that his refusal to bargain had not "played any part in" the parties' failure to consummate a collective bargaining agreement. For reasons we have explained, it is clear to us that that is not what *Dal Porto II* intended: *Dal Porto II* followed *Martori Brothers Distributors'* example by selecting the third, or but-for, test enumerated and discussed in that case, and thus must be understood to have rejected the first and second alternative tests. In its full context, the language the UFW has quoted from *Dal Porto II* is at worst an overly broad paraphrase of the but-for rule more clearly stated in *Dal Porto II*'s next sentence.

The UFW also takes, from the passage in response to Dal Porto's impasse argument we have quoted above, *Dal Porto II*'s statement that "Dal Porto must show its refusal to bargain had no effect on the failure to reach agreement." But the passage is pertinent only to Dal Porto's impasse argument, and in this context the reference to "no effect" (as, again, the next sentence makes clear) accurately states the distinct rule that there can be no impasse if the negotiating deadlock is to any extent attributable to the failure of a party to bargain in good faith. (Cf. *Dal Porto II, supra,* 191 Cal.App.3d at p. 1212.)

We conclude that, for purposes of make-whole analysis, under the but-for test Bertuccio was not required to prove that his own bad faith had no effect on the parties' failure to reach agreement.

3. *Sufficiency of the Evidence*

The UFW vigorously challenged the sufficiency of Bertuccio's evidence in proceedings before the Board, but renewed its challenge in this court only at oral argument, when counsel for the UFW assured us that the union "absolutely" asserts that the evidence before the Board was in any event insufficient to meet the but-for standard.

We have reviewed the evidence under applicable standards of review. The Board's findings of fact "if supported by substantial evidence on the record considered as a whole shall . . . be conclusive." (Lab. Code § 1160.8.) "Of course we do not reweigh the evidence. If there is a plausible basis for the Board's factual decisions, we are not concerned that contrary findings may seem to us equally reasonable, or even more so. [Citations.]" (*Rivcom Corp.* v. *Agricultural Labor Relations Bd.* (1983) 34 Cal.3d 743, 756-757 [195 Cal.Rptr. 651, 670 P.2d 305].) Nevertheless the court must assess the entire record. (*Carl Joseph Maggio, Inc.* v. *Agricultural Labor*

*Relations Bd.* (1984) 154 Cal.App.3d 40, 54-55 [201 Cal.Rptr. 30]; cf. *Nash-DeCamp Co.* v. *Agricultural Labor Relations Bd.* (1983) 146 Cal.App.3d 92, 97-98 [193 Cal.Rptr. 910]; *Sunnyside Nurseries, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 93 Cal.App.3d 922, 930 [156 Cal.Rptr. 152].)

 Bertuccio had specified that the crucial issue upon which (in his view) the parties legitimately and (at least for the make-whole period) irreconcilably disagreed was wage rates. In its order setting Bertuccio's contention for hearing, the Board stated that Bertuccio "shall have the burden of demonstrating, pursuant to *Dal Porto* [*II*] . . . , that due to conditions unique to San Benito County agriculture it would not, in good faith, have entered into a contract calling for wages higher than were economically feasible in San Benito County, even in the absence of its proved bad faith bargaining."

Superficially viewed, the Board's statement gave only one side of the issue: The question to be addressed was whether, but for Bertuccio's refusal to bargain, the parties would (or would not) have *reached agreement*, a bilateral process involving not only Bertuccio but also the UFW. Thus it would not have been sufficient for Bertuccio to show that in good faith he would not have offered rates "higher than were economically feasible in San Benito County" if he could not also show that the UFW would not have agreed to come down to rates that *were* "economically feasible in San Benito County."

But any arguable omission is not critical, because it is apparent that the parties and the Board understood the point: Evidence on the UFW's position was received, and in its decision the Board clearly recognized that Bertuccio's burden included showing that the UFW would not come down to meet him.

We regard the Board's statement as an accurate reflection of the crux issue at the hearing: The meaning of *economic feasibility* as it related to the good faith of Bertuccio's wage rate proposals.

Reduced to its essence, the UFW's argument is that Bertuccio did not prove that he bargained in good faith on wage rates because he did not prove that he could not have afforded to pay higher rates. In the terms of the Board's order, the UFW's position was that a wage rate would be feasible as long as Bertuccio could afford to pay it.

It is clear enough that (whether or not he could have done so) Bertuccio did not *prove* that he could not have paid higher rates consistent with an

abstractly reasonable profit margin. The record indicates that he did not produce, and perhaps did not have, comprehensive and coherent financial records for his business and thus was unable (for example) to produce cost analyses for his various crops. Instead he began from the premise that the UFW would not accept less than the wage rates specified in its 1979 collective bargaining agreement with Salinas grower Sun Harvest, and (to prove that in good faith he would not have offered Sun Harvest rates) relied on evidence:

(1) That growers other than Bertuccio who, like Bertuccio, were based in San Benito County paid rates lower than Sun Harvest rates (or rates in Monterey County generally);

(2) That the only growers operating in San Benito County who paid Sun Harvest rates were based in other counties and maintained multicounty farming operations, unlike Bertuccio;

(3) That San Benito County's mix of agricultural crops differed from those in nearby counties and consisted of "lower value" or "lower end" crops;

(4) That San Benito County ranked behind nearby counties in gross proceeds from agricultural products, both because of its crop mix and because it had considerably less irrigated farmland;

(5) That in one crop, lettuce, grown both by Bertuccio and other San Benito County-based growers and in nearby counties, the quality of the San Benito County lettuce was generally inferior because of higher temperatures in San Benito County and therefore the San Benito County lettuce could not command the prices obtained in nearby counties;

(6) That Bertuccio's own operation lacked the cooling equipment necessary to market lettuce at higher prices;

(7) That Bertuccio's own crop mix was so different from the standard agricultural production in nearby counties as to render useful comparison impossible;

(8) That in fixing wage rates each San Benito County-based grower, including Bertuccio, historically took into account only rates paid by other San Benito County-based growers and not the wages paid in nearby counties, because each of them wished to remain competitive with the others and none of them regarded higher rates paid in other counties as relevant to their competitive situations;

(9) That Bertuccio and other San Benito County-based growers drew their workers almost exclusively from among San Benito County residents; and

(10) That economic factors such as smaller population, lower living and education standards, lack of a manufacturing base, and a higher unemployment rate rationalized a wage rate lower in San Benito County than in nearby counties.

Bertuccio's evidence, presented through or on the basis of the testimony of a number of lay and expert witnesses, was not speculative in the abstract. The critical question is whether the evidence tended to prove that Bertuccio's persistent refusal to pay Sun Harvest rates could be regarded as a good faith bargaining position, absent any proof that he *could not* pay Sun Harvest rates consistent with a reasonable profit from his farm operation. ▮ ▮ We agree in the abstract with the Board's generalization that "an employer may insist in good faith on wage rates that are less than it could afford to pay," given the ALRA's general provision that the duty to bargain in good faith does not compel either party to agree (Lab. Code, § 1155.2, subd. (a)), and, more specifically, the perception that a grower surely should be at liberty to seek in good faith a profit margin somewhat higher than the union wishes to concede. But at the same time we must recognize that absent evidence of *inability* to pay higher rates a grower's *unwillingness* to do so will float considerably nearer the indistinct line between permissible profit-driven business planning and an impermissible determination not to enter into any collective bargaining agreement. The UFW colorably argues that several of the elements of Bertuccio's proof must be devalued by the likelihood that wage rates are lower in San Benito County at least in part because the UFW has not yet fully unionized San Benito County growers.

Nevertheless we conclude that enough of the elements of proof we have enumerated support the Board's conclusion to permit that conclusion to stand. We necessarily deal here, in some measure, with motivation: With Bertuccio's subjective state of mind with respect to wage rates. ▮ ▮ It is settled that the Board should have a measure of leeway to assess subjective state of mind: "As a rule, motive must be inferred from all the circumstances, and the Board's expertise entitles it to considerable deference in deciding that question. [Citations.]" (*Rivcom Corp.* v. *Agricultural Labor Relations Bd.*, *supra*, 34 Cal.3d 743, 757; cf. *Royal Packing Co.* v. *Agricultural Labor Relations Bd.*, *supra*, 101 Cal.App.3d 826, 835-836; cf. also *Shattuck Denn Mining Corp.* v. *N.L.R.B.* (9th Cir. 1966) 362 F.2d 466, 470.) Giving the Board such leeway, we shall sustain the Board's finding that upon a good faith assessment of San Benito County economic conditions, and of the economic feasibility of paying higher wage rates in light of

those conditions, Bertuccio would, and in good faith could, have refused throughout the makewhole period to pay Sun Harvest rates.

The Board's remaining pertinent findings were that (even, implicitly, had Bertuccio not refused to bargain) the UFW would have insisted throughout the makewhole period on wage rates at or above the Sun Harvest rates, and that this insistence would not have been the result of Bertuccio's adjudicated bad faith conduct apart from direct refusal to bargain. We shall not belabor this point. We disagree with the assertion of counsel for the UFW, at oral argument, that "the only way to measure what the UFW would do in the face of good faith bargaining is to bargain in good faith": The assertion patently incorporates, at odds with *Dal Porto II*, the UFW's theory that Bertuccio was required to show his refusal to bargain had *no effect* on the failure to agree. The record contains substantial evidence of the UFW's determination, throughout the makewhole period and without reference to Bertuccio's conduct or misconduct, that growers generally and Bertuccio in particular should be bargained up to Sun Harvest rates.

In sum the record sufficiently supports the Board's conclusion that Bertuccio had borne his *Dal Porto II* burden: That within the makewhole period the parties would not have reached agreement as to wage rates, and therefore would not have consummated a collective bargaining agreement, even in the absence of Bertuccio's unlawful refusal to bargain.

The decision of the Agricultural Labor Relations Board is affirmed.

Cottle, P. J., and Wunderlich, J., concurred